# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| ELECTRICAL MEDICAL TRUST and PLUMBERS LOCAL UNION NO. 68 WELFARE FUND,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. ANESTHESIA PARTNERS, INC., WELSH, CARSON, ANDERSON & STOWE XI, L.P., WCAS ASSOCIATES XI, LLC, WELSH, CARSON, ANDERSON & STOWE XII, L.P., WCAS ASSOCIATES XII, LLC, WCAS MANAGEMENT CORPORATION, WCAS MANAGEMENT, L.P., and WCAS MANAGEMENT, LLC,<br><br>Defendants. | Case No. 4:23-cv-04398<br><br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

JURISDICTION AND VENUE ...........................................................................5

THE PARTIES .......................................................................................................5

    A.    Plaintiff Electrical Medical Trust ...............................................5

    B.    Plaintiff Plumbers Local Union No. 68 Welfare Fund .............6

    C.    Defendant USAP ........................................................................6

    D.    Defendant Welsh Carson ...........................................................7

FACTUAL ALLEGATIONS ...............................................................................10

    I.    THE RELEVANT MARKETS ....................................................10

    A.    Product Market: Hospital-Only Anesthesia Services
        Reimbursed by Commercial Payors ........................................10

    B.    The Relevant Geographic Markets ..........................................13

        1.    Austin, Dallas, and Houston MSAs...............................14

        2.    Combined Texas Major Metropolitan Areas.................15

        3.    Texas ...............................................................................17

    II.    USAP AND WELSH CARSON'S ANTICOMPETITIVE
        SERIAL ACQUISITION SCHEME................................................19

    A.    Welsh Carson Decides to Invest in an "Aggressive 'Buy
        and Build' Consolidation Strategy."........................................19

    B.    Welsh Carson and New Day Launch Their Consolidation
        Strategy by Acquiring Greater Houston Anesthesiology. .......20

    III.    USAP ACQUIRES ANOTHER FIFTEEN TEXAS
        ANESTHESIA PRACTICES............................................................25

    A.    Lake Travis Anesthesiology .....................................................25

    B.    North Houston Anesthesiology-Kingwood Division...............25

    C.    Pinnacle Anesthesia Consultants .............................................26

    D.    Anesthesia Consultants of Dallas ............................................28

    E.    Excel Anesthesia Consultants ..................................................29

# TABLE OF CONTENTS
## (continued)

Page

F. Southwest Anesthesia Associates ............................................29

G. BMW Anesthesiology and Medical City Physicians...............30

H. Sundance Anesthesia ................................................................30

I. East Texas Anesthesiology Associates ....................................31

J. MetroWest Anesthesia Care .....................................................31

K. Capitol Anesthesiology Association ........................................32

L. Amarillo Anesthesia Consultants.............................................33

M. Star Anesthesia........................................................................33

N. Guardian Anesthesia Services..................................................34

IV. MONOPOLY POWER ........................................................................34

A. USAP Uses Its Monopoly Power to Charge Monopoly
Prices.......................................................................................34

B. Market Share and Concentration Data Also Evince
USAP's Monopoly Power.........................................................36

C. USAP's Monopoly Power Is Durable and Resistant to
Competition..............................................................................43

D. USAP's Monopolization Sacrificed Quality.............................45

E. Welsh Carson and USAP's Scheme Did Not Create
Efficiencies That Benefited Patients or Payors........................49

F. Welsh Carson and USAP's Violation of the Antitrust
Laws Has Had a Continuing Impact. .......................................50

V. USAP ALSO AGREED TO FIX PRICES WITH AT LEAST
THREE GROUPS. ...............................................................................51

A. USAP's Agreement with Methodist Hospital Physician
Organization.............................................................................52

B. USAP's Agreement with Dallas Anesthesiology
Associates.................................................................................53

C. USAP's Agreement with Baylor College of Medicine............55

**TABLE OF CONTENTS**
**(continued)**

| | | | Page |
|---|---|---|---|

D.     USAP's Attempted Agreement with a University of Texas Group ...................................................... 56

VI.     THE FEDERAL TRADE COMMISSION FILES SUIT. ................. 57

VII.     USAP ALSO AGREED TO ALLOCATE A MARKET ................... 57

CLASS ACTION ALLEGATIONS ........................................................ 58

     A.     Numerosity (Rule 23(a)(1)) ................................... 58

     B.     Commonality (Rule 23(a)(2)) ................................ 58

     C.     Typicality (Rule 23(a)(3)) ...................................... 59

     D.     Adequacy (Rule 23(a)(4) and 23(g)) ..................... 60

     E.     Rule 23(b)(2) ........................................................ 60

     F.     Rule 23(b)(3) ........................................................ 60

VIOLATIONS ..................................................................................... 61

     COUNT ONE Monopolization Section Two of the Sherman Act ............. 61

     COUNT TWO Unlawful Acquisition Section Seven of the Clayton Act ................................................................. 62

     COUNT THREE Conspiracy to Monopolize Section Two of the Sherman Act ........................................................ 63

     COUNT FOUR Attempted Monopolization Section Two of the Sherman Act ........................................................ 65

     COUNT FIVE Horizontal Agreements to Fix Prices Section One of the Sherman Act .................................................. 66

     COUNT SIX Horizontal Agreement to Divide Market Section One of the Sherman Act .................................................. 68

PRAYER FOR RELIEF ....................................................................... 69

DEMAND FOR JURY TRIAL ............................................................. 71

Plaintiffs Electrical Medical Trust and Plumbers Local Union No. 68 Welfare Fund, through their counsel, on behalf of themselves and all others similarly situated, bring this class action complaint under Section Seven of the Clayton Act, 15 U.S.C. § 18, Section One of the Sherman Act, 15 U.S.C. § 1, and Section Two of the Sherman Act, 15 U.S.C. § 2, and allege as follows:

## **INTRODUCTION**

1.      This lawsuit challenges a multi-year anticompetitive scheme by Defendant U.S. Anesthesia Partners, Inc. ("USAP") and Defendant Welsh, Carson, Anderson & Stowe ("Welsh Carson")[1] to monopolize hospital anesthesia services in Texas, drive up prices, and increase their profits.

2.      Welsh Carson is a multibillion-dollar New York-based private equity firm.  In 2012, it formed USAP, a physician services organization that "partners" with—a euphemism for acquires—anesthesia providers.  Defendants pitch USAP to doctor groups as a more efficient anesthesiology firm with money to invest in quality.  Welsh Carson and USAP's actual strategy, however, has nothing to do with improving efficiency or quality.

---

[1] Welsh Carson refers collectively to Defendants Welsh, Carson, Anderson & Stowe XI, L.P.; WCAS Associates XI, LLC; Welsh, Carson, Anderson & Stowe XII, L.P.; WCAS Associates XII, LLC; WCAS Management Corporation; WCAS Management, L.P.; and WCAS Management, LLC.

3.      Instead, from USAP's conception, Defendants planned and pursued an "aggressive 'buy and build' consolidation strategy" targeting "practices with high market share in a few key markets."  Welsh Carson and USAP knew that if they could buy their way to a dominant market share, then USAP would have enhanced "[n]egotiating leverage with commercial payors" enabling it to raise prices for anesthesia services.

4.      <u>First Target: Greater Houston Anesthesiology.</u>  Defendants laid the foundation for the scheme by acquiring Greater Houston Anesthesiology.  They targeted this group for two main reasons.  First, it was "the largest anesthesia physician group in the greater Houston region," with 220 physicians and 180 certified registered nurse anesthetists ("CRNAs").  Second, Greater Houston Anesthesiology had the highest reimbursement rates in Houston.  These attributes aligned perfectly with Defendants' strategy to buy market share and raise prices.  Defendants completed that acquisition in December 2012, effectively firing the starting pistol for their "anesthesiology consolidation strategy."

5.      In an internal January 2013 presentation, Welsh Carson and USAP laid out the next step in their plan: USAP would "Roll Up Houston" through a series of "tuck-in acquisitions" while simultaneously expanding in other Texas cities.  The recently acquired Greater Houston Anesthesiology would serve as the "platform" into which USAP would fold future acquisitions.  For those

acquisitions, Defendants planned to target anesthesia practices with exclusive hospital contracts—particularly with hospitals considered important to insurers—to "bolster [USAP's] market share and drive profitability" without competing.

6.      <u>Expanding Across Texas.</u>  Welsh Carson and USAP successfully executed that plan.  USAP acquired sixteen anesthesia groups, including the dominant providers in Austin, Dallas, and Houston, creating an anesthesia behemoth with more than 1,000 providers.  By revenue, USAP has approximately 73% of the hospital-only anesthesia market across those areas.  At best, USAP faces fringe competition.  Its two 'largest' rivals each only have an approximate 10% share of anesthesiology cases—six times less than USAP.  This disparity is even larger for revenue.  The next largest group is eight times smaller than USAP by revenue.  Today, USAP's dominance extends across Texas: It has 57% of the hospital-only anesthesia market for the state by revenue.

7.      USAP's dominance within and among Austin, Dallas, and Houston gives USAP enormous bargaining leverage; any insurer who might defy its pricing demands would face the specter of having the majority of anesthesiologists in Austin, Dallas, and Houston simultaneously fall out-of-network.  As an executive at the largest health insurer in Texas explained, "[E]very time [USAP] folded in a geographic region or every time that they grew, it just strengthened their ability to raise rates and . . . leverage at the negotiating table."

8.     <u>Raising Prices.</u>  Welsh Carson and USAP have ruthlessly exploited their leverage to raise prices.  After each acquisition, USAP has raised the target's prices to Greater Houston Anesthesiology's higher reimbursement rate and continued to increase prices—without corresponding quality improvements.  One United executive astutely described the result of USAP's serial acquisitions: "[Y]ou've basically taken the highest rate of all in one distinct market and then peanut butter spread that across the entire state of Texas."  USAP's current reimbursement rates are now "nearly 40% more expensive than the average cost of all other anesthesia providers in Texas" and far exceed the median rate.

9.     <u>Fixing Prices.</u>  That is not all.  When Welsh Carson and USAP could not buy the competition, they entered agreements with their would-be rivals.  Defendants formed price-fixing agreements with at least three anesthesia groups, including their two largest rivals.  USAP's executives recognized these agreements were "odd from a compliance standpoint."  USAP also agreed with another physician group that provides anesthesiology services to allocate the market.  Through these agreements, Welsh Carson and USAP further increased prices.

10.     <u>Injured Health Plans.</u>  Because of Welsh Carson and USAP's consolidation scheme and agreements with competitors, Plaintiffs Electrical Medical Trust and Plumbers Local Union No. 68 Welfare Fund and the Proposed Class have paid artificially inflated reimbursement rates for hospital-only

anesthesia services in the Texas and Austin, Dallas, and Houston markets.  The

Federal Trade Commission recently brought a case to enjoin this conduct.  By

bringing this action, Plaintiffs seek to vindicate—on behalf of themselves and

those similarly situated—their rights under the antitrust laws, restore competition

for anesthesiology services, and recover damages for overcharges.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to

Sections Four and Sixteen of the Clayton Act, 15 U.S.C. §§ 15, 26, and 28 U.S.C.

§§ 1331, 1337.

12.     Venue is proper in this District under Section Twelve of the Clayton

Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b).

13.     The Court has personal jurisdiction over each Defendant under

Section Twelve of the Clayton Act, 15 U.S.C. § 22, and Federal Rule of Civil

Procedure Four, and one or more Defendants may be found in this District.

## THE PARTIES

### A.     Plaintiff Electrical Medical Trust

14.     Plaintiff Electrical Medical Trust is an employee benefit plan

headquartered in Houston, Texas.  Electrical Medical Trust has nearly 5,400

members across the Houston Gulf Coast Area.  Electrical Medical Trust self-funds

its members' health insurance and uses a third-party administrator.  Members can

choose between three plans: Kelsey Care HMO, Memorial Hermann ACO, and

Aetna POS Choice II.  Electrical Medical Trust directly reimburses healthcare providers who treat its members.  During the Class Period, Electrical Medical Trust paid USAP for hospital anesthesia services provided to its plan participants.

### B.   Plaintiff Plumbers Local Union No. 68 Welfare Fund

15.     Plaintiff Plumbers Local Union No. 68 Welfare Fund is an employee benefit plan headquartered in Houston, Texas and has about 5,300 members across Houston, Galveston, Beaumont, Bryan, College Station, Victoria, Corpus Christi, the Rio Grande Valley, and 62 surrounding counties.  Plumbers Local Union No. 68 Welfare Fund is a self-funded plan that provides members and their families a comprehensive benefits package, including medical, vision, dental, prescription, life insurance, and short-term disability insurance.  Plumbers Local Union No. 68 Welfare Fund provides this plan in partnership with United Healthcare, which provides access to its network and negotiates rates with providers.  Plumbers Local Union No. 68 Welfare Fund directly reimburses healthcare providers who treat its members.  During the Class Period, Plumbers Local Union No. 68 Welfare Fund paid USAP for hospital anesthesia services that USAP provided to its plan participants.

### C.   Defendant USAP

16.     Defendant U.S. Anesthesia Partners, Inc. is a for-profit Delaware corporation, with its principal place of business at 12222 Merit Drive, Suite 700,

Dallas, Texas 75251.  USAP has over 4,500 anesthesia providers across Colorado,

Florida, Indiana, Kansas, Kentucky, Maryland, Nevada, Oklahoma, Ohio,

Tennessee, Texas, Washington, and Washington D.C.

### D.    Defendant Welsh Carson

17.    Defendant Welsh, Carson, Anderson & Stowe is a private equity firm

headquartered at 599 Lexington Avenue, Suite 1800, New York, New York 10022.

Welsh Carson co-founded USAP in 2012.  Since its founding, Welsh Carson has

controlled or directed and invested in USAP through five management

organizations—Defendant WCAS Management Corporation; Defendant WCAS XI

Associates, LLC; Defendant WCAS Associates XII, LLC; Defendant WCAS

Management, L.P.; and Defendant WCAS Management, LLC—and two

investment funds, Defendant Welsh, Carson, Anderson & Stowe XI, L.P. and

Defendant Welsh, Carson, Anderson & Stowe XII, L.P.  Welsh Carson partners

control the various management entities by serving as officers or "managing

members."  The management entities, in turn, control the management funds.

18.    Because these eight Defendants function as a single entity with a

shared identity, this Complaint collectively refers to them as "Welsh Carson."

They all share the trademarks "WCAS" and "Welsh, Carson, Anderson & Stowe,"

which are registered to Defendant WCAS Management Corp.; use the same

principal place of business, 599 Lexington Avenue, Suite 1800, New York, New

York 10022; and share corporate officers.  For instance, D. Scott Mackesy, Welsh Carson's "Managing Partner of the Firm," is also a managing member of Defendants WCAS XI and XII Associates, LLC, President and a director of Defendant Welsh Carson Management Corp., and a managing member and director of Welsh Carson Management, LLC.

19.     In 2012, Welsh Carson owned 50.2% of USAP.  By 2017, Welsh Carson owned 44.8% after granting equity to physicians it acquired.  That year, Welsh Carson sold part of its equity to Berkshire Partners and GIC Capital, retaining an ownership stake of 23%.

20.     Welsh Carson formally controls a company when one of its funds owns or has rights to more than 50% of its shares.  Additionally, Welsh Carson exercises control—even when it owns less than 50%—through representation on the company's board of directors, hiring executives to manage the company, and daily supervision by Welsh Carson personnel.  Welsh Carson has used each of these tools to control USAP since its founding through the present.  Indeed, Welsh Carson has dubbed itself USAP's "primary architect."

21.     Until 2017, Welsh Carson controlled a majority of the company's board of directors; it either had authority to appoint a majority or held voting rights of the other shareholders.  Welsh Carson itself said that it "in all practical respects" continued to control USAP.  Even after selling part of its ownership in 2017,

USAP's CEO and Chairman continued to view Welsh Carson as its "most influential" board member.  It currently has the authority to appoint two members. Welsh Carson has used its authority to appoint individuals affiliated with itself. Those appointments include Brian Regan, a Welsh Carson partner who directed and implemented USAP's consolidation strategy.

22.     At the time of USAP's founding, Welsh Carson hired its CEO, CFO, COO, and head of Human Resources.  Like this initial team, many subsequent senior hires previously worked for other Welsh Carson companies, including USAP's Vice President of Payor Contracting and its current CEO.

23.     Welsh Carson has also controlled USAP by supervising its day-to-day operations, including corporate finances, securing financing from lenders or Welsh Carson funds, identifying targets, conducting due diligence on potential acquisitions, negotiating acquisitions, negotiating prices with insurers, and determining USAP's overall strategy.

24.     Welsh Carson has feasted on USAP's monopoly profits—receiving total dividend payments of nearly $435 million.

## FACTUAL ALLEGATIONS

### I.  THE RELEVANT MARKETS

#### A.  Product Market: Hospital-Only Anesthesia Services Reimbursed by Commercial Payors

25.  <u>Hospital-Only Anesthesia Services.</u>  A relevant product market is hospital-only anesthesia services reimbursed by commercial payors. Anesthesiologists administer medications to prevent patients from feeling pain during medical procedures or surgery.  This case concerns hospital-only anesthesia services.  Hospital-only anesthesia services include inpatient anesthesia services and outpatient anesthesia services that must be provided in a hospital because the patient may require emergency medical services only available at a hospital.

26.  The industry recognizes the distinct characteristics of hospital-only anesthesia services.  The Centers for Medicare and Medicaid Services ("CMS") maintains a list of billing codes that distinguishes between hospital and other anesthesia services used by government insurers.  Some private insurers formally require similar billing practices, and many hospitals adopt the CMS list to remain certified for government insurance programs.

27.  Anesthesia services at outpatient surgery centers, ambulatory surgical centers, or doctors' offices cannot substitute for hospital-only services.  Patients requiring hospital admission to receive treatment necessarily must receive anesthesia services in a hospital.  Similarly, patients whose outpatient procedures

or surgeries must occur in a hospital due to their medical needs or the risks associated with the surgery must receive anesthesia services in a hospital. Because non-negotiable medical considerations drive these decisions, patients and insurers cannot switch to different anesthesia services in response to a small but significant non-transitory increase in price. Similarly, when required by the nature of the procedure, no substitute exists for the services of an anesthesiologist.

28.     The contracting and scheduling practices of hospitals also differentiate hospital-only anesthesiology services. Some hospitals engage only one anesthesiology practice. This gives the hospital a central hub for scheduling dozens of procedures per day. It also allows the hospital to implement accountability-of-care quality measures with the practice. In order to be the sole practice for a hospital, however, an anesthesiology provider must employ a certain number of physicians and be able to staff procedures on a 24/7 basis, which not all practices do.

29.     Defendants recognize hospital-only anesthesia services as a distinct market. When analyzing possible acquisitions, Welsh Carson and USAP repeatedly focused on the target's presence within hospital systems or at individual facilities without regard to ambulatory surgical centers. Greater Houston Anesthesiology, for example, was an attractive initial acquisition because it had a high "wallet share" at Houston's four largest hospital systems.

30.   <u>Commercial Insurers.</u>  The relevant market also only includes services paid for by commercial insurance plans, including self-funded insurance plans like Plaintiffs.

31.   Commercial insurers typically pay substantially higher reimbursement rates than the government.  On average, private rates are nearly double those paid by Medicare for inpatient services.[2]  Commercial insurers negotiate with providers to set reimbursement rates.  Medicare reimbursement rates, by contrast, are set at the federal level by the government based on recommendations from a committee of medical specialists.[3]  USAP recognizes this distinction.  It tracks commercial insurers' pricing without reference to government insurance.

32.   Anesthesia services provided to government insurance beneficiaries cannot be substituted for those same services provided to commercial insurance beneficiaries.  Commercial subscribers cannot switch from commercial to government insurance in response to a small but significant non-transitory price increase for hospital-only anesthesia services because government insurance plans

---

[2] Eric Lopez et al., *How Much More Than Medicare Do Private Insurers Pay? A Review of the Literature*, KFF (Apr. 15, 2015), https://www.kff.org/medicare/issue-brief/how-much-more-than-medicare-do-private-insurers-pay-a-review-of-the-literature/.

[3] John O'Shea et al., *The Medicare Physician Fee Schedule: Overview, Influence on Healthcare Spending, and Policy Options to Fix the Current Payment System*, Mercatus Center (May 24, 2023), https://www.mercatus.org/research/policy-briefs/medicare-physician-fee-schedule-overview-influence-healthcare-spending-and.

have specific eligibility requirements.  For example, Medicare has an age requirement, and Medicaid eligibility depends on income.

### B.   The Relevant Geographic Markets

33.    In a typical and competitive market, prices depend on a straightforward relationship between output and consumer demand.  Healthcare markets, however, are unique.  In the private insurance market, individual patients choose among different doctors and facilities.  Generally, people strongly prefer to obtain healthcare services in the area where they live.  Price, however, does not strongly factor into consumer choice at the point of service.  One reason for this is that the need for healthcare is often non-deferable.  Another is that insured individuals do not (subject to co-pays) pay out-of-pocket for most treatments.  Instead, individuals pay for healthcare insurance, often through their employer or labor union, which in turn pays healthcare providers.  To meet this need, commercial insurers such as Blue Cross and United Healthcare build provider networks, and self-funded insurers sometimes contract with insurers for access to those networks.  Prices depend on the terms of the contracts between payors and providers.

34.    Health insurers view geographic markets differently than consumers.  At any given time, an individual consumer only seeks healthcare in a single local area.  By contrast, insurers must simultaneously contract with providers for

different locations because they must offer plans and accordingly maintain networks in multiple geographies.  Providers operating in multiple geographies, especially high-demand geographies, benefit from a multiplier effect in negotiations with insurers—the more areas in which a provider operates, the more disruptive it is for an insurer to exclude a provider from its network.  For example, a hypothetical provider that dominates three geographies would have more power than three individual monopolists, because during negotiations it has an even greater ability to make non-agreement "painful" for the insurer.  And because state-wide demand for healthcare is typically consolidated in a few major metropolitan areas, a provider can monopolize an entire state by capturing key geographies.

35.     In this case, USAP's monopoly power can be detected at each of three levels of relevant markets: 1) Austin, Dallas, and Houston, 2) those three geographies combined, and 3) Texas.

### 1.     **Austin, Dallas, and Houston MSAs**

36.     Three initial relevant geographic markets are the Austin Metropolitan Statistical Area ("MSA"), the Dallas-Fort Worth MSA, and the Houston MSA.

37.     The Austin metropolitan statistical area includes the following counties: Bastrop, Caldwell, Hays, Travis, and Williamson.  The Dallas MSA includes the following counties: Collin, Dallas, Denton, Ellis, Hood, Hunt,

Johnson, Kaufman, Parker, Rockwall, Somervell, Tarrant, and Wise. The Houston MSA includes the following counties: Austin, Brazoria, Chambers, Fort Bend, Galveston, Harris, Liberty, Montgomery, and Waller.

38.     The Austin, Dallas, and Houston MSAs are each relevant markets because people strongly prefer to obtain healthcare services in the area where they live. From the individual's perspective, hospital-only anesthesia services offered outside of their given MSA are not a substitute. As a result, insurers contract with anesthesia providers in the same geographies as their enrollees.

39.     Furthermore, patients do not choose their anesthesia provider. Instead, patients pick their hospital, and the hospital staffs procedures with anesthesia providers. Like patients, hospitals prefer local providers to avoid travel and lodging costs. They also often need to staff procedures on 24 hours' notice or less. They, therefore, need a ready supply of local anesthesiologists, whether on an exclusive contract or an open staffing model; out-of-area providers do not offer a reasonable substitute. Thus, a hypothetical monopolist of hospital-only anesthesiology services in any of these MSAs could impose a small but significant and non-transitory increase in prices above competitive levels.

### 2.     Combined Texas Major Metropolitan Areas

40.     A relevant geographic market also consists of the Austin MSA, Dallas-Fort Worth MSA, and Houston MSA together.

41.     As described above, providers operating in this market will enjoy a multiplier effect in negotiations with insurers, which ties together the Austin, Dallas, and Houston MSAs into a relevant geographic market for assessing market power.  These three markets include the principal economic centers of the State of Texas.  The population of this relevant market is 17.7 million—over half of Texas's population of 30 million, and including some of its biggest employers.[4] No insurer seeking to offer a product to residents of this State could afford to do without all three of these localities.  Hence, a hypothetical monopolist of hospital-only anesthesiology services in all three MSAs could profitably impose a small but significant non-transitory price increase on commercial payors.  Indeed, USAP *did* profitably impose such price increases.  According to United Healthcare, USAP's rates in 2020 were "nearly 40% more expensive than the average cost of all other anesthesia providers in Texas" and as much as 110% above the statewide median.

42.     USAP's own acquisition strategy—to spread Houston rates like "peanut butter" over Austin and Dallas—confirms the connection of these MSAs. USAP targeted these MSAs precisely because of the power inherent in combining them in one contracting package.

---

[4] U.S. Census Bureau, *Metropolitan and Micropolitan Statistical Areas Population Totals: 2022-2022*, https://www.census.gov/data/tables/time-series/demo/popest/2020s-total-metro-and-micro-statistical-areas.html (last updated June 13, 2023); U.S. Census Bureau, *QuickFacts Texas*, https://www.census.gov/quickfacts/fact/table/TX/PST045222 (last accessed Nov. 15, 2023).

### 3.   **Texas**

43.     A relevant geographic market is Texas.

44.     As described above, businesses often make the initial selection of which insurance to offer employees.  Accordingly, insurers must build networks that are attractive to employers.  A threshold requirement is that networks include sufficient providers where companies' employees live and work.  Large employers typically have workers in multiple geographies, and that is true for major Texas employers.  For example, AT&T, H-E-B, and Walmart employ individuals across the state.[5]  This also includes, of course, the State of Texas, which employs over half a million people and offers health insurance to these employees and their families through programs such as the Texas Employees Group Benefits Program and the Teacher Retirement System of Texas.  Many large healthcare insurers service the entire state.

45.     Hospital-only anesthesia services by providers located outside of Texas cannot be substituted for in-state providers.  Individuals typically prefer to

---

[5] *See* Dallas Reg'l Chamber, *Top Employers*, https://www.dallaschamber.org/wp-content/uploads/2018/04/Business-TopEmployers.pdf (last accessed Nov. 15, 2023) (AT&T and Walmart); Greater: SATX Reg'l Econ. P'ship, *SATX Major Employers*, https://greatersatx.com/business-in-satx/major-employers/ (last accessed Nov. 15, 2023) (H-E-B); Harris Cnty. Tex. Econ. Dev., *Largest 100 Houston Area Employers*, https://hcoed.harriscountytx.gov/docs/Largest_100_Employers.pdf (last accessed Nov. 15, 2023) (H-E-B, Walmart, and AT&T); Tyler Econ. Dev. Council, *Major Employers*, https://tedc.org/site-selectors/major-employers (last accessed Nov. 15, 2023) (Walmart).

receive healthcare near where they work and live and, again, employers consider that preference when contracting for healthcare insurance.  Moreover, to issue healthcare insurance through Texas' federally-facilitated exchange, the Affordable Care Act requires insurers to "maintain[] a network that is sufficient in number and types of providers, . . .  to ensure that all services will be accessible without unreasonable delay."[6]  Texas also requires insurers to maintain networks such that "travel distances from any point in its service area to a point of service are no greater than" thirty miles for general hospital care and seventy-five miles for specialty care.[7]  Further, Texas requires providers to obtain state certification before they may practice in Texas.  These regulatory barriers, not to mention travel and lodging costs, prevent anesthesia providers in other states from serving as substitutes that can constrain prices.

46.     USAP and Welsh Carson's actions confirm that Texas is a relevant market.  To strengthen its pricing power in the state, USAP acquired practices in smaller geographies—Amarillo, San Antonio, and Tyler—to prevent another group from achieving a state-wide scale that could possibly challenge USAP.  For instance, San Antonio-based Star Anesthesia expanded into Houston and announced intentions to expand across Texas before USAP acquired it.  USAP

---

[6] 45 C.F.R. § 156.230(a)(1)(ii) (2023).
[7] 28 Tex. Admin. Code §§ 11.1607(h), 3.3704(f)(8) (2023) (additionally specifying 30 miles from hospitals in nonrural areas and 60 miles for rural areas).

similarly acquired a group in Amarillo to prevent a Dallas-based group from doing the same and building a state-level presence.

47.     The Texas market also satisfies the SSNIP test.  A hypothetical monopolist of hospital-only anesthesiology services in Texas could profitably impose a small but significant non-transitory price increase on commercial payors. As described above, USAP did just that.

## II.     USAP AND WELSH CARSON'S ANTICOMPETITIVE SERIAL ACQUISITION SCHEME

### A.     Welsh Carson Decides to Invest in an "Aggressive 'Buy and Build' Consolidation Strategy."

48.     In early 2012, John Rizzo, a former executive at a large national anesthesia group, emailed D. Scott Mackesy, a partner at Welsh Carson, seeking investors for a new anesthesia practice: "New Day Anesthesia."  He planned to establish a nationwide presence by pursuing an "aggressive 'buy and build' consolidation strategy."

49.     As part of that plan, Brian Regan, a junior partner, evaluated the proposed investment and worked with Rizzo on presenting New Day to Welsh Carson's partnership.  That presentation explained New Day Anesthesia would pursue an "anesthesiology consolidation strategy."  The "[g]oal for New Day" would be "to build a platform with national scale by consolidating practices with high market share in a few key markets."  The proposed plan focused on

consolidation because Welsh Carson understood that market share would give New Day "[n]egotiating leverage with commercial payors" to raise prices.

50.     That aggressive consolidation plan convinced Welsh Carson to invest in New Day.  The private equity firm agreed to "[c]ommit $1-$2 million to set-up [sic] shop, develop a market roadmap, and diligence acquisition candidates" and "devote real time and resources to New Day and the anesthesiology consolidation strategy."

## B.     **Welsh Carson and New Day Launch Their Consolidation Strategy by Acquiring Greater Houston Anesthesiology.**

51.     First, Welsh Carson hired Kristen Bratberg to be the CEO of New Day.  Bratberg had already successfully implemented a similar consolidation strategy as the CEO of Pediatrix—Welsh Carson's physician group for neonatologists—overseeing more than 100 acquisitions.

52.     Greater Houston Anesthesiology.  Regan and Bratberg worked together to identify New Day's first acquisition.  In June 2012, New Day and Welsh Carson, represented by Regan, signed a letter of interest with Greater Houston Anesthesiology, which described itself as "20 times the size of the second largest local competitor."  Welsh Carson and New Day shortly thereafter pitched the potential deal to Greater Houston Anesthesiology's physicians, highlighting their plan for aggressive consolidation.  On August 29, 2012, Welsh Carson and New Day submitted a formal Letter of Intent signed by Bratberg and Rizzo for

New Day and Regan for WCAS Associates XI.  That letter explained Welsh

Carson would help fund the acquisition by contributing from one of its investment

funds, WCAS XI.  For the rest of the required funds, New Day would borrow from

third-party lenders.

53.     Welsh Carson carefully analyzed whether New Day should acquire

Greater Houston Anesthesiology.  As part of this analysis, the firm hired three

consulting groups, and each recommended the deal.  Avalere Health noted that

anesthesiologists "have more power than most specialists," and that Greater

Houston Anesthesiology's "commanding market share" only "magnified" its

power.  Stax, Inc. noted that Greater Houston Anesthesiology was "the largest

anesthesia physician group in the greater Houston region," as "the closest groups to

GHA in size are academic in nature, with most independent groups being much

smaller."  Additionally, Stax, Inc. found that Greater Houston Anesthesiology was

"well-positioned within the [Houston region], and specifically within the four

major hospital systems"—Houston Methodist, Memorial Hermann, St. Luke's, and

HCA, which performed almost 65% of all inpatient surgeries in Houston.  Savvy

Sherpa's report focused on prices.  It observed that Greater Houston

Anesthesiology "achieved very good levels of reimbursement from commercial

payers."  This analysis confirmed what Regan heard from an ambulatory surgical

center executive—that Greater Houston Anesthesiology had the "best rates."

Further, Savvy Sherpa advised that USAP would be able to spread its higher reimbursement rates to other practices it acquired.

54.     Having vetted Greater Houston Anesthesiology, Welsh Carson and New Day pitched the deal to lenders in October 2012.  They stressed that Greater Houston Anesthesiology had the "best rates" and "commanding market share." Regan explained that these attributes made Greater Houston Anesthesiology the perfect cornerstone from which Welsh Carson and New Day planned to "build a platform with national scale by consolidating practices with high market share in a few key markets."  By capturing a dominant market share and creating national scale, it would have "[n]egotiating leverage with commercial payors" to raise anesthesia service prices.  That pitch worked.  Welsh Carson and USAP secured debt financing from a consortium that included General Electric Capital, KeyBank, Bank of America, Wells Fargo, and Ares Capital.

55.     <u>Welsh Carson XI Fund.</u>  Meanwhile, Welsh Carson and New Day sought and ultimately received financing from the Welsh Carson XI fund.  A November 2012 memo to Welsh Carson's "Investment Professionals" from Mackesy, Regan, and four others made a similar pitch, explaining that Greater Houston Anesthesiology would be the first acquisition in a "roll-up strategy."

56.     With funding from Welsh Carson and private lenders secured, Defendants announced the formation of USAP on November 19, 2012.  Less than a

month later, on December 12, 2012, USAP agreed to acquire Greater Houston Anesthesiology.

57.   <u>Expanding Acquisition Targets.</u>  Welsh Carson and USAP immediately began looking for more practices to acquire.  The next day, USAP, represented by Bratberg and Rizzo, met with Regan and other Welsh Carson employees in New York to strategize.  A January 2013 presentation—bearing USAP and Welsh Carson's logos—laid out that plan.  USAP would "Roll Up Houston" through a series of "tuck-in acquisitions" that could be folded into Greater Houston Anesthesiology, while simultaneously expanding to other markets.  After each acquisition, USAP would raise the new practitioners' reimbursement rates to those of Greater Houston Anesthesiology.  To efficiently "bolster [USAP's] market share and drive profitability"—by quickly amassing negotiating leverage to raise prices—Defendants decided to target anesthesia practices with exclusive hospital contracts, preferably hospitals that insurers had to include in their networks.  A Welsh Carson analyst explained the importance of contracts with major hospitals to a potential lender: "[I]f a payor refuses to give us the pricing that we're looking for, then the threat of us going out-of-network would be more painful on the payor than it would be on us. . . .  [W]hen we cover every major hospital in the market, it doesn't really have much of an impact on us.  All the while, the payor would be responsible for reimbursing at out-of-network rates

which are substantially higher than what we see on an in-network basis . . . ."
Going out of network could also disrupt patients' access to surgeries.  This plan
also took advantage of the fact that anesthesia hospital contracts are "sticky,"
meaning hospitals infrequently switch anesthesia providers.

58.     USAP and Welsh Carson also knew USAP had "room to expand its
footprint throughout Texas."  Early on, Defendants identified Dallas and Austin as
attractive targets.  Like Houston, four major hospital systems in Dallas conducted a
large share of surgical cases: Texas Health Resources, Baylor Scott & White, HCA
North Texas (operating as Medical City), and Methodist Health System.
Defendants knew that each acquisition would increase USAP's leverage with
commercial payors.

59.     Defendants intended for Welsh Carson to be a key decision-maker in
USAP's consolidation strategy.  USAP's 2013 "Business Development Playbook"
states that it is "important that [Welsh Carson] remains fully informed" and that
analyzing potential acquisitions "will typically involve multiple
memos/presentation decks and discussions with [Welsh Carson]."  The playbook
further provided that "the deal must be reviewed and approved by Welsh Carson"
before USAP may issue a letter of intent.

### III.   USAP ACQUIRES ANOTHER FIFTEEN TEXAS ANESTHESIA PRACTICES.

#### A.   Lake Travis Anesthesiology

60.   In July 2013, USAP acquired Lake Travis Anesthesia, a small group that provided coverage for Lakeway Hospital.  USAP, at that time, already had a presence in Austin; Greater Houston Anesthesiology had been the fourteenth largest group in the area when USAP acquired it.  Despite its small size, USAP executives described this acquisition as a chance to get "points on the board[:] growth in Austin" and a platform to "[c]ontinue GHA's expansion into [the] Austin MSA."

#### B.   North Houston Anesthesiology-Kingwood Division

61.   In June 2014, USAP acquired a division of North Houston Anesthesiology located in Kingwood, which numbered twenty-one physicians and nine CRNAs.  This acquisition fit Welsh Carson and USAP's plan to target practices with important hospital contracts.  The Kingwood Division had "[s]trategic hospital affiliation[s]" with HCA Kingwood and Memorial Heimann Northeast.  After this acquisition, Defendants pronounced USAP the "clear leader" in Houston hospital-based anesthesiology services with the next largest anesthesia group "less than 5% the size of USAP."  USAP then raised Kingwood's reimbursement rates.

C.    **Pinnacle Anesthesia Consultants**

62.    In early 2013, Pinnacle Anesthesia Consultants contacted USAP about "explor[ing] potential business opportunities concerning future strategic partnerships."  Pinnacle was an ideal target for USAP.  Defendants estimated that it had 26% of the anesthesia providers and performed about 40% of the anesthesia services in Dallas.  Moreover, it had a powerful presence in the four hospital systems: approximately 54% of the case volume in the HCA system, 52% in the Baylor system, 42% in the Texas Health Resources system, and 22% in the Methodist Dallas system.

63.    Rizzo and Bratberg met Pinnacle's President and Chairman Mike Hicks and CEO Michael Saunders, and during that conversation, Hicks explained that "he has wanted to do what [USAP is] doing for years."  Indeed, Pinnacle had a "wish list" of acquisition targets—Anesthesia Consultants of Dallas, Excel Anesthesia Consultants, and North Texas Anesthesia Consultants—which USAP would soon tick off.

64.    The possibility for more dominance intrigued USAP and Welsh Carson.  Regan found Pinnacle "an interesting opportunity" and "definitely a worthwhile discussion given the size of their group and market."  Similarly, Bratberg thought acquiring Pinnacle "[c]ould be strategically a huge step forward from a Texas and national standpoint."  Others at Welsh Carson observed the

acquisition had a "[s]ignificant potential revenue upside applying [USAP's Houston] rates" to Pinnacle.

65.     Again, USAP and Welsh Carson hired consulting firms to assess whether USAP should acquire Pinnacle.  They reported that Pinnacle had exclusive hospital contracts—uncommon for Dallas—and that other anesthesia practices "pose[d] no strategic or competitive threat to Pinnacle."  Additionally, the consulting firms recommended that USAP subsequently acquire other practices providing anesthesia services to "key [hospital] system facilities not served by Pinnacle" to obtain more "exclusive contracts over time."

66.     On September 13, 2013, USAP, Welsh Carson, and Pinnacle signed a letter of intent.  That letter stated that Defendants intended to "expand throughout Texas by acquiring other local anesthesia groups."  Brian Regan signed the letter for WCAS Associates XI, the general partner entity for the WCAS XI fund.  In January 2014, USAP completed the acquisition, and Pinnacle's 320 anesthesiologists and 217 CRNAs joined Defendants' growing anesthesia empire. Welsh Carson funded the deal by purchasing additional USAP shares.

67.     USAP, post-acquisition, spread its inflated reimbursement rates to the former Pinnacle providers.  Although insurers initially tried to resist, USAP prevailed, including over an insurer that treated the new USAP providers as out of network and arbitrated its reimbursement rates for over two years.

68.     Afterward, Welsh Carson and USAP strategized how to prevent similar resistance after future acquisitions.  Defendants developed a new contract clause, which they referred to as the "tuck-in clause," to clarify that USAP's rates would apply after an acquisition.  USAP's Vice President of Payor Contracting, Alan Glenesk, sought Regan's approval on the drafting of this clause.  USAP used its bargaining power to impose this clause on insurers moving forward.

### D.   Anesthesia Consultants of Dallas

69.     In January 2015, USAP acquired Anesthesia Consultants of Dallas, which had twenty-one physicians and twenty-nine CRNAs.  Tom Swygert, a USAP anesthesiologist in Dallas, described Anesthesia Consultants of Dallas to Bratberg and Regan as one of the practices with "the largest number of anesthesiologists with specialized skill sets in the DFW market."  If it acquired Anesthesia Consultants of Dallas, Swygert projected that USAP could "create a barrier to entry and promote our ability to garner system contracts."  Anesthesia Consultants of Dallas also had strong ties with major Dallas hospitals.  These included exclusive contracts with the Methodist Dallas flagship facility and a Texas Regional Medical Center facility.  Additionally, Anesthesia Consultants of Dallas served other Methodist Dallas hospitals and another nine open-staffed hospitals.  USAP increased the reimbursement rates of Anesthesia Consultants of Dallas providers after it acquired the group.

### E.      Excel Anesthesia Consultants

70.      In March 2015, USAP acquired Excel Anesthesia Consultants, which had fifty-five physicians and nineteen CRNAs after its recent merger with North Texas Anesthesia Consultants.  Excel had an exclusive contract with Health Presbyterian Hospital Dallas, the second largest hospital in the Texas Health Resources system, and served more than twenty hospitals across the four major systems.  USAP acquired Excel because its "broad reach and relationships across the Dallas market" would "[p]osition[] [USAP] to obtain exclusive facility contracts."  Regan called this acquisition "our most strategic move in the market next to [Anesthesia Consultants of Dallas]."

71.      Furthermore, this acquisition enabled USAP to eliminate a competitor. Excel already "compete[d] directly with some of the [Pinnacle] divisions . . . within the open-staff hospitals," and Regan feared that another group might acquire Excel to create "a 100 doc [sic] competitive practice with a strong sub specialty orientation in our backyard."  Acquiring Excel "create[d] a barrier to entry" by eliminating a possible foothold.  Unsurprisingly, USAP increased the reimbursement rates of Excel providers after this acquisition.

### F.      Southwest Anesthesia Associates

72.      USAP acquired Southwest Anesthesia Associates in December 2015. Despite being a smaller group, it had an exclusive contract with Charlton

Methodist.  USAP, consistent with past practice, raised its reimbursement rates after acquiring Southwest.

### G.     **BMW Anesthesiology and Medical City Physicians**

73.    In January 2016, USAP acquired two practices: BMW Anesthesiology, with nine anesthesiologists, and seven unaffiliated anesthesiologists referred to as Medical City Physicians.  USAP pursued both acquisitions to increase its case coverage at Medical City Dallas from 30% to 80%.  BMW had additional "strategic value due to their strong participation in leadership roles in the Dallas HCA flagship hospital[.]"  Because Medical City Physicians included the newly elected chief of anesthesia, it also held "a key strategic position within Medical City and HCA."  USAP increased BMW and Medical City reimbursement rates following these acquisitions.

### H.     **Sundance Anesthesia**

74.    In April 2016, USAP acquired Sundance Anesthesia, which had seven physicians and twenty-four CRNAs.  It also had an exclusive contract with Texas Health Resources' Southwest Fort Worth hospital.  USAP's Chief Operating Officer called this acquisition "a huge win, that's a key THR site we didn't have.  Great work[!]"  Once again, USAP increased Sundance's reimbursement rates after the acquisition.

### I.     East Texas Anesthesiology Associates

75.     In June 2016, USAP acquired East Texas Anesthesiology Associates in Tyler, Texas.  The group had twenty-three physicians and eleven CRNAs. USAP acquired the East Texas Anesthesiology Associates because it covered more than half of the cases and revenue at the East Texas Medical Center in Tyler and had a near-exclusive contract with the University of Texas Health Science Center at Tyler.  After the acquisition, USAP increased East Texas Anesthesiology Associates' reimbursement rates.

### J.     MetroWest Anesthesia Care

76.     In March 2017, USAP acquired MetroWest Anesthesia Care, which numbered fifty-one physicians and seventy-nine CRNAs.  USAP singled out MetroWest as a "high-priority" target for two reasons.  First, USAP's Director of Business Development worried that another large group would enter Houston and "spoil the entire market" by acquiring MetroWest—indeed, the group considered selling to Sheridan Healthcare, now Envision Physician Services, in 2014.  USAP, given this concern, viewed acquiring MetroWest as a "defensive" deal to "preserve the protected market."  Second, MetroWest had exclusive contracts with hospitals in the Memorial Hermann system.  By 2016, that system suggested it would be "moving to a single source anesthesia provider," and USAP was concerned it would be unable to win the single provider contract over MetroWest.  USAP thus

acquired MetroWest to "further expand its relationship with Memorial Hermann" without competing.

77.     After the acquisition, Blue Cross reported that USAP "[a]ccounted for . . . 69% of cases and 83% of cost in Houston" and that USAP "leverag[ed] market share" to establish rates over two times higher than other Houston anesthesiologists.

### K.   Capitol Anesthesiology Association

78.     In February 2018, USAP acquired the Capitol Anesthesiology Association.  Capitol was the largest group in Austin, numbering 80 physicians and 152 CRNAs.  Capitol was on USAP's and Welsh Carson's radar since 2013 because it had a "substantial market position in Austin": exclusive contracts with five of the eleven hospitals in the Seton system—the largest in Austin, a presence in five more, and exclusive contracts at multiple other Austin-area hospitals. Shortly before the acquisition, USAP described Capitol as having a "[l]arge share of [a] great market in top hospital systems" in Austin with "significant organic growth for the last 3 years, although they have seen a market share decline from 75% to around 50% today."

79.     After the acquisition, USAP increased Capitol's reimbursement rates. Regarding those increases, Capitol's Vice President of Operations and soon-to-be USAP executive celebrated, "Awesome! Cha-ching!"

### L.     Amarillo Anesthesia Consultants

80.     In July 2018, USAP acquired Amarillo Anesthesia, which had ten physicians and ten CRNAs. This group dominated the Amarillo market: Cigna estimated that it covered up to 85% of cases. Further, Amarillo Anesthesia Consultants' relevance extended beyond the local market. It had an exclusive contract at Baptist St. Anthony's Hospital, the largest of Amarillo's two hospitals, and an important facility in the Ardent Health System, with which USAP wanted exclusive agreements elsewhere. By acquiring Amarillo Anesthesia, USAP prevented another large anesthesia group, Metro/IPN, from acquiring Amarillo Anesthesia and gaining a foothold in Amarillo and the Ardent Health System. USAP increased Amarillo Anesthesia's reimbursement rates after the acquisition.

### M.     Star Anesthesia

81.     In September 2019, USAP acquired San Antonio-based Star Anesthesia. With one hundred eighty-two physicians and twelve CRNAs, Star was the largest remaining independent anesthesia practice in Texas. USAP and Welsh Carson first earmarked Star as a potential acquisition in 2013 because it had exclusive contracts with the HCA co-owned Methodist San Antonio hospital system. Over time, Star became an increasingly competitive threat to USAP. Star entered the Houston market in March 2016 by acquiring the division of North Houston Anesthesiology that rejected USAP's offer in 2014. Worried about Star's

relationship with HCA, Regan decided USAP "need[ed] to do a system deal with HCA and kick these guys [i.e., Star] out of town."  USAP also attempted to acquire Star.  For a while, Star resisted.  It told at least one insurer that it planned to expand, and insurers such as United sought to make Star "a statewide messenger model to be a competitor against USAP."  USAP's overtures ultimately succeeded, and it acquired Star in 2019.  Afterward, USAP raised Star's reimbursement rates.

### N.  **Guardian Anesthesia Services**

82.    In January 2020, USAP acquired Guardian Anesthesia Services, which had twenty-one physicians and fifty-six CRNAs.  USAP first singled out Guardian in 2013 because the group had exclusive contracts with three HCA hospitals in Houston.  However, Guardian declined multiple bids from USAP. During that time, Guardian beat out USAP for an exclusive contract at HCA's new Pearland Hospital.  USAP eventually eliminated competition from Guardian by acquiring it.  USAP increased Guardian's reimbursement rates after the acquisition.

## IV.  **MONOPOLY POWER**

### A.  **USAP Uses Its Monopoly Power to Charge Monopoly Prices.**

83.    USAP's ability to control price regardless of local market dynamics offers direct evidence of its monopoly power.  As one United Healthcare executive explained, "[Y]ou've basically taken the highest rate of all in one distinct market and then peanut butter spread that across the entire state of Texas."  USAP also

successfully imposed rate increases on insurers.  According to United, USAP's rates in 2020 were "nearly 40% more expensive than the average cost of all other anesthesia providers in Texas" and as much as 110% above the statewide median. Similar increases occurred within the individual Austin, Dallas, and Houston markets and the three-MSA market.  Another insured estimated that it spent approximately $119 million on USAP anesthesia services in Texas by 2016. Changes in quality or other factors do not explain these increases—in the view of one United Healthcare executive, USAP's "quality performance is not meaningfully better than their peers."

84.    USAP's price increases are consistent with academic literature studying the impact of private equity ownership on healthcare costs.  One study found that contracting with a private equity-backed physician management company increases costs for anesthesia services at outpatient facilities by approximately 26% compared to facilities that contract with independent providers.[8]  The study attributed 10 percentage points of that increase directly to private equity ownership alone.[9]  This causal relationship holds true across practice

---

[8] Ambar La Forgia et al., *Association of Physician Management Companies and Private Equity Investment With Commercial Health Care Prices Paid to Anesthesia Practitioners*, 182 JAMA Internal Med. 396, 410 (2022).
[9] *Id.*

areas—economists have also found private equity acquisitions to be associated with price increases in dermatology, gastroenterology, and ophthalmology.[10]

**B.    Market Share and Concentration Data Also Evince USAP's Monopoly Power.**

85.    USAP's dominant market share also demonstrates its monopoly power in the relevant markets.  To start, USAP's acquisitions amassed at least 813 anesthesiologists in the three-MSA market and 1,028 anesthesiologists across Texas.  Similarly, those acquisitions covered at least 765 CRNAs in Austin, Dallas, and Houston and 798 total across Texas.  As a result, in 2019, USAP finally achieved Texas market share in excess of 50%, reaching 60% in 2020.  As of 2021, USAP had 57% market share statewide by revenue.

**Figure 1: USAP Statewide Market Share**
(By Revenue)



---

[10] Yashaswini Singh et al., *Association of private equity acquisition of physician practices with changes in health care spending*, JAMA Health F., Sept. 2, 2022, at 9.

86.     USAP also has a dominant share within the three-MSA market.  By case volume, USAP has approximately 64% of that market and is six times larger than the next provider.  Figure 2 shows USAP's case volume share relative to other groups.

87.     This measure may *understate* USAP's market share because it includes commercially insured hospital-only anesthesia services provided at academic medical centers by professors, residents, and fellows.  Academic anesthesiologists may not be perfect substitutes for nearby non-academic providers due to institutional constraints on service.  Payors therefore do not necessarily consider them when evaluating provider dominance.  For example, one insurer estimated that in 2020, USAP controlled "over 80% of anesthesia in Houston.  In DFW, similar dominance" excluding academic groups.

**Figure 2: Austin-Dallas-Houston Combined Market Shares**
(2021, By Cases)



- U.S. Anesthesia Partners
- UT Physicians
- North American Partners in Anesthesia
- Texans Anesthesia Associates
- Compass Anesthesia Providers
- Baylor College of Medicine
- Best Choice Anesthesia & Pain
- Metropolitan Anesthesia Consultants
- NorthStar Anesthesia
- Anesthesia Partners of Dallas
- Allen Anesthesia Associates
- Noble Anesthesia Partners
- Scott & White Physicians
- Westlake Anesthesia

88.     By revenue, USAP has approximately 73% market share, and has 8 times more revenue than the next largest provider.

**Figure 3: Austin-Dallas-Houston Combined Market Shares**
(2021, By Revenue)



| | |
|---|---|
| ■ U.S. Anesthesia Partners | ■ UT Physicians |
| ■ North American Partners in Anesthesia | ■ Texans Anesthesia Associates |
| ■ Compass Anesthesia Providers | ■ Baylor College of Medicine |
| ■ Best Choice Anesthesia & Pain | ■ Metropolitan Anesthesia Consultants |
| ■ NorthStar Anesthesia | ■ Anesthesia Partners of Dallas |
| ■ Allen Anesthesia Associates | ■ Noble Anesthesia Partners |
| ■ Scott & White Physicians | ■ Westlake Anesthesia |

89.     USAP also has a dominant share of each individual MSA—the patient-level measures of demand and market power, which also drive payor demand.  It has more than 50% of case volume in Dallas and Houston.  By revenue, USAP exceeds a 50% share in Austin, Dallas, and Houston.



**Figure 4: USAP Share in Individual Metropolitan Statistical Areas in 2021**

90.     The Herfindahl-Hirschman Index ("HHI") also demonstrates that the relevant markets are highly concentrated.  Courts and regulators rely on HHI for evaluation of market concentration and of the predicted effects of changes in market concentration.  To calculate HHI, the percent-denominated market shares of each participant are squared and summed.  A perfectly monopolized market, in which a single participant holds a 100% market share, has an HHI of 10,000 (as 100^2 = 10,000), while a perfectly competitive market in which every participant holds negligible market share (effectively 0%) has an HHI of 0.  A merger resulting in an increase of more than 100 and a total HHI of more than 1,800 will

be regarded as creating a "highly concentrated market" and as presumptively anticompetitive.

91.    Although information to calculate HHI for Texas is not publically available, USAP's market share alone means that the total is greater than 1,849 by case volume and 3,249 by revenue.  Total HHI for the Austin-Dallas-Houston market is 4,299 by case volume and 5,452 by revenue.  Respectively, the three-MSA market HHI figures more than double and triple the threshold for highly concentrated markets.

92.    Increasing HHI in the individual MSAs also demonstrates USAP's monopoly.  USAP's acquisitions increased concentration above a total HHI of 1800 in each MSA with two or more acquisitions.  Additionally, eight acquisitions individually resulted in an HHI of over 100 in an MSA: North Houston—Kingwood Division, Anesthesia Consultants of Dallas, Excel, Southwest Associates, Sundance, MetroWest, Capitol, and Guardian.

93.    The figures below show HHIs after USAP's acquisitions in each geography.



Figure 5: Post-Acquisition Anesthesiology Concentration in the Austin Metropolitan Statistical Area



Figure 6: Post-Acquisition Anestheisology Concentration in the Dallas Metropolitan Statistical Area



Figure 7: Post-Acquisition Anestheisology Concentration in the Houston Metropolitan Statistical Area

94.     Although share and concentration in any one MSA provide additional evidence, they systematically *understate* USAP's current monopoly power, because these measures fail to account for the fact that healthcare providers negotiate reimbursement rates with insurers that must offer plans and maintain networks that cover members multiple cities.  In other words, insurers have less bargaining power when negotiating with healthcare providers that cover multiple geographies.  USAP amassed additional monopoly power in Austin, Dallas, and Houston each time it acquired a Texas anesthesia practice, *regardless of where the acquisition occurred*.

95.     USAP's acquisitions of Pinnacle and Amarillo Anesthesia demonstrate this phenomenon.  As USAP's first acquisitions in Dallas and Amarillo, neither meaningfully increased concentration in those MSAs.  However, USAP still successfully negotiated rate increases with Blue Cross in those MSAs after those acquisitions because of its presence throughout Texas.  Greater Houston Anesthesiology and Amarillo Anesthesia had previously failed to negotiate increases when they each only had a strong presence in one market.

### C.     <u>USAP's Monopoly Power Is Durable and Resistant to Competition.</u>

96.     New competition does not threaten USAP.  Instead, USAP's market share has only increased over time despite its regular price increases.  In 2015, a

Welsh Carson associate bragged to lenders that USAP's contract retention rate had "effectively been 100%."

97.     Potential providers cannot quickly enter the market. Individuals must undergo years of education and training to become an anesthesiologist or CRNA. Additionally, providers must obtain a license from a state regulatory board. Nor can anesthesia providers easily increase their volume of cases. Providing adequate medical care to patients necessarily caps the output of an anesthesiologist or CRNA. Furthermore, demand for anesthesiology is highly price-inelastic, like most non-elective healthcare. In other words, a new entrant with lower prices could not hope to generate and capture new demand for anesthesiology; demand for anesthesiology services depends on doctors' collective medical decisions about which procedures to recommend to patients, not the price of anesthesia.

98.     Widespread use—and USAP's high number—of exclusive contracts poses another barrier to entry. To start, those contracts are "sticky." Hospitals rarely change providers in part because payors, not hospitals, pay for anesthesia. To compete for those contracts, an anesthesiology group must be large enough to staff a hospital. Establishing such a group would require recruiting providers or acquiring multiple independent practices. USAP has made these already difficult tasks near impossible. Its contracts with providers include a carrot and stick to prevent attrition: Equity vesting rules incentivize providers to stay with USAP or

lose out financially, and non-compete clauses prevent providers from leaving to join nearby anesthesia groups.

### D.   USAP's Monopolization Sacrificed Quality.

99.   Private equity consolidation is inherently at odds with high quality healthcare.  Firms like Welsh Carson typically aim to exit investments within three to seven years and earn an annual return of at least 20%.[11]  Academics have observed that the private equity model sacrifices quality of care to generate short-term returns for investors: The "rollup strategy, where a large platform practice is acquired and additional practices are 'added on,' gives the firm increased market power in a specialty or geographic region. . . . Ultimately, in such settings, consolidation leads to higher costs and lower quality care." [12]

100.   Quality Studies.  Quantitative studies have found that private equity ownership lowered quality of care in nursing homes, dialysis provision, and hospitals.[13]  In each setting, staffing levels suffered.  Those outcomes are the

---

[11] Sajith Matthews & Renato Roxas, *Private equity and its effect on patients: a window into the future*, 23 Int'l J. Health Econ. Mgmt. 673, 674 (2023).

[12] *Id.* at 675.

[13] Charlene Harrington et al., *Nurse Staffing and Deficiencies in the Largest For-Profit Nursing Home Chains and Chains Owned By Private Equity Companies*, 47 Health Serv. Res. 106, 118 (2011); Thomas G. Wollmann, *How to Get Away with Merger: Stealth Consolidation and Its Real Effects on US Healthcare* 34 (Nat'l Bureau of Econ. Rsch., Working Paper No. 27274, 2021); Joseph Bruch et al., *Characteristics of Private Equity-Owned Hospitals in 2018*, 174 Ann. Internal Med. 277, 278 (2021).

natural consequence of the private equity model—the "focus on generating cash flow and exiting the investment in a five-year window puts pressure on doctors to increase volumes of patients seen per day . . . ."[14]

101.   Welsh Carson and USAP are no different.  Defendants' singular focus on amassing market share degraded the quality of hospital-only anesthesia services.  According to a former USAP anesthesiologist in Colorado, "the firm's relentless drive to grow burned out physicians which, he said, detracted from quality."[15]

102.   <u>Real Life Consequences.</u>  USAP's patients have born the consequences.  For instance, in October 2022, a Dallas jury found that a USAP anesthesiologist and CRNA's negligence caused a twenty-seven-year old patient, Carlos David Castro Rojas, to suffer a catastrophic brain injury.[16]  According to the allegations of his complaint, Rojas broke his shin when he fell off a ladder at his job hanging Christmas lights.[17]  To fix the break, he underwent a surgery at Baylor

---

[14] Eileen Appelbaum, *Private Equity Buyouts in Healthcare: Who Wins, Who Loses*? 3 (Inst. for New Econ. Thinking, Working Paper No. 118, 2020).

[15] Peter Whoriskey, *Financiers bought up anesthesia practices, then raised prices*, Wash. Post (June 29, 2023), https://www.washingtonpost.com/business/2023/06/29/private-equity-medical-practices-raise-prices/.

[16] Mark Smith, *Dallas jury awards $21M to patient who was put under anesthesia and suffered brain injury*, WFAA (Oct. 31, 2022), https://www.wfaa.com/article/news/local/investigates/dallas-jury-awards-21m-to-patient-who-suffered-brain-injury/287-9f1c5fab-fb69-40c4-bc64-17b5f59a789a.

[17] Pl.'s First Am. Pet. ¶¶ 24-25, *Graterol v Martin*, No. CC-19-05599-E (Dallas

University Medical Center requiring general anesthesia.[18]  A USAP
anesthesiologist and CRNA treated Rojas.[19]  His brain suffered a severe lack of
oxygen while under anesthesia, and Rojas was unresponsive for more than a week
following the procedure.[20]  Unfortunately, he never recovered.  Rojas is still in a
vegetative state, unable to communicate, walk, or feed himself, and requires
twenty-four-hour care.[21]  Rojas's mother, Wilda Jenniffer Rojas Graterol, had to
move to Dallas and dedicate her life to caring for her incapacitated son.[22]  Rojas's
USAP anesthesiologist was never in the operating room during his surgery,
possibly because they had to supervise three other CRNAs in different operating
rooms at the same time.[23]  What is more, no one told Rojas he had the right to
choose to have an anesthesiologist treat him instead of a CRNA or explained the
difference between those providers.[24]  His lawsuit revealed that to "make more
money, USAP and [Baylor] keep patients in the dark and place patients at greater
risk by pushing the CRNA model on patients."[25]

---

Cnty. Ct. July 9, 2021).

[18] *Id.* at ¶¶ 25-27.

[19] *Id.* at ¶ 33.

[20] *Id.* at ¶¶ 55, 61.

[21] *Id.* at ¶ 62.

[22] *Id.*

[23] *Id.*; Smith, *supra* note 16.

[24] *Graterol*, *supra* note 17, at ¶ 32.

[25] *Id.*

103.   Rojas is not the only patient injured by USAP.  Since 2012, another

fifty patients or family members have filed malpractice cases against USAP in

Texas.[26]

104.   Those individuals include Wayneka Wallace and her child J.W.[27]

According to the complaint, a USAP doctor administered an epidural to Wallace at

Texas Health Arlington Memorial Hospital after she went into labor.[28]  That

anesthesiologist then immediately left her room.[29]  Afterwards, her other providers

laid Wallace flat on her back.[30]  That position decreased blood flow to Wallace's

baby and caused fetal distress.[31]  Wallace's doctors conducted an emergency

cesarean section, but it was too late.  J.W. had already suffered brain damage.[32]

105.   USAP's providers insufficiently dosed another patient, Van Wooten,

with muscle relaxant during a kidney transplant procedure according to his

complaint.[33]  As a result, Wooten moved during the procedure, ripping the graft

---

[26] *See* Ex. 1.

[27] Pl.'s Original Pet., *Wallace v. Miller*, No. 236-331336-22 (Tarrant Cnty. Ct. July 10, 2021).

[28] *Id.* at ¶¶ 6.01-6.09.

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] Pl.'s Original Pet. ¶¶ 12-13, 19, *Wooten v. Hyatt*, No. 342-423058-21 (Tarrant Cnty. Ct. Mar. 15, 2021).

connecting the transplant kidney.[34]  Although Wooten's surgeon stopped the

bleeding, it was too risky to place the transplant kidney a second time because it

had been warm and without blood flow for too long.[35]  Based on the pleadings, it

appears that USAP's anesthesiologist was once again absent; the complaint alleges

that the *surgeon* had to instruct the USAP CRNA to increase the muscle relaxer

dose after Wooten started to move.[36]

       **E.**    **Welsh Carson and USAP's Scheme Did Not Create Efficiencies That Benefited Patients or Payors.**

    106.    Welsh Carson and USAP's internal documents make clear their

strategy hinged on capturing dominant market share to create "[n]egotiating

leverage with commercial payors" and not efficiencies that would be passed on to

payors and patients in the form of costs or higher quality.  Indeed, private equity

consolidation offers virtually no unique efficiencies.  Firms like Welsh Carson

have little to no medical expertise.  Providers can also obtain potential efficiencies

associated with economics of scale without selling to a physician management

organization—for example, by joining a group purchasing organization to lower

input costs or contracting with a back-office administrator.  Furthermore,

anesthesiology has relatively low overhead costs compared to other practices,

making the opportunities for "efficiencies" even sparser.  Anesthesiologists, for

---

[34] *Id.*

[35] *Id.* at ¶ 14.

[36] *Id.* at ¶ 13.

instance, rarely rent or own office space since they treat patients at hospitals or other facilities.

107.   Instead, the upside for private equity firms consists of creating market power, as discussed above, and accounting arbitrage.  "Smaller acquisitions are purchased at 2-4x EBITDA [earnings before interest, taxes, depreciation and amortization], while platform practices are purchased at 8-12x EBITDA.  Once the practices are merged, the smaller practice's valuation increases and becomes that of the larger practice (8-12x EBITDA)."[37]  Private equity firms are thus able to profit from consolidation without creating meaningful or pro-competitive efficiencies.  Welsh Carson profited this way in 2017, when it sold approximately 50% of its stake in USAP to Berkshire Partners and GIC Capital.  And to the extent any of these acquisitions did reduce any overhead, the resulting concentration in the market guaranteed that the benefit would be reaped by USAP, as opposed to patients or payors.

F.   **Welsh Carson and USAP's Violation of the Antitrust Laws Has Had a Continuing Impact.**

108.   Defendants' anticompetitive anesthesia consolidation scheme began in 2012 when they formed USAP by acquiring Greater Houston Anesthesiology.  Defendants furthered their scheme by acquiring at least another fifteen anesthesia physician groups in Texas.  Most recently, USAP acquired Guardian Anesthesia

---

[37] Matthews, *supra* note 11, at 674.

Services in January of 2020.  As explained above, each acquisition built USAP's

pricing power by giving USAP additional negotiating leverage with insurers.  In

2019, USAP finally achieved 50% share in Texas, rising to 60% in 2020.  The

impact of the scheme continues to be felt in every anesthesia reimbursement for

which USAP receives higher rates than it would have absent its consolidation.

## V.   USAP ALSO AGREED TO FIX PRICES WITH AT LEAST THREE GROUPS.

109.   When Welsh Carson and USAP could not buy their competitors, they

instead sought to "work something out that would be mutually beneficial and

acceptable to everyone."  Defendants implemented price-fixing agreements with at

least three independent anesthesia groups in Houston and Dallas and tried to reach

similar agreements with others.  In each agreement, another group assigned USAP

authority to bill and receive reimbursements for hospital-only anesthesia services

provided by their physicians.  USAP used that authority to charge payors its higher

rates.

110.   USAP's executives were aware of these agreements' illicit nature.

One executive remarked that it "seems odd from a compliance standpoint" for

USAP to bill for services provided by another group and "keep[] the revenue."

USAP's Vice President of Payor Relations was concerned they "might possibly

compromise" USAP's obligation to insurers "due to compliance issues related to

pass through billing."

**A.** **USAP's Agreement with Methodist Hospital Physician Organization**

111.    When USAP acquired Greater Houston Anesthesiology, it inherited a pre-existing price-fixing agreement between Greater Houston Anesthesiology and Methodist Hospital Physician Organization, a non-profit anesthesia group associated with the Houston Methodist Hospital and Weill Cornell School of Medicine.  As an academic group, it did not offer an acquisition target for USAP. For example, one academic group explained that it "d[id] not view USAP employment as a viable option."

112.    In July 2005, Greater Houston Anesthesiology had agreed to retain Methodist's anesthesia providers to serve Houston Methodist Hospital.  Under that contract, "GHA will bill and collect, in the name of GHA and using GHA provider numbers, for Services furnished by" Methodist's providers.  In exchange, Methodist assigned to Greater Houston Anesthesiology authority to bill and receive payments for those services.  Greater Houston Anesthesiology used its billing authority to charge payors higher reimbursement rates for Methodist's services.

113.    Greater Houston Anesthesiology used that contract to secure an exclusive contract with the Houston Methodist Hospital.  That exclusive contract required it to "provide seamless Anesthesia Services with TMH[PO] physicians"

and retain "anesthesiologists employed by TMHPO, including, but not limited to cardiovascular anesthesiologists" to serve the hospital.

114.   Since acquiring Greater Houston Anesthesiology, USAP has continued to set Methodist Hospital Physician's reimbursement rates and bill payors at that higher rate.  The pricing authority USAP received from this agreement was unnecessary; USAP could have provided administrative services without the authority to determine a competitor's prices and has done so at least once.  Because of this price-fixing agreement, Plaintiffs and the Class paid more than they otherwise would have for hospital-only anesthesia services.

### B.   USAP's Agreement with Dallas Anesthesiology Associates

115.   When USAP acquired Pinnacle, it inherited a pre-existing price-fixing agreement that Pinnacle had entered into with Dallas Anesthesiology Associates, an independent group with twenty providers.

116.   In October 2008, Pinnacle won an exclusive contract to provide anesthesia services to Baylor University Medical Center.  A condition of that contract, however, was that Pinnacle would staff the hospital "together with Dallas Anesthesia [sic] Associates," which had a strong relationship with the hospital.  To fulfill that condition, Pinnacle made an agreement with Dallas Anesthesiology Associates.  In exchange for providing anesthesia services at Baylor University Medical Center, Dallas Anesthesiology Associates agreed that "Pinnacle shall bill

and collect, or cause to be billed and collected" reimbursements for those services using its name and tax identification number.  Dallas Anesthesiology Associates also assigned "all of [their] rights and interest in receiving payment" to Pinnacle.  Under that agreement, Pinnacle set the rates it charged payors for anesthesia services provided by Dallas Anesthesiology Associates.

117.   Since acquiring Pinnacle, USAP has continued to set Dallas Anesthesiology Associates' reimbursement rates and bill payors at that higher rate for services that the other group provided at Baylor University Medical Center.  The pricing authority USAP received from this agreement was unnecessary; USAP could have provided administrative services without the authority to determine a competitor's prices and has done so at least once.  USAP "collects a nice margin on the business" because it compensates Dallas Anesthesiology Associates based on that group's lower rate.

118.   Pinnacle and USAP kept patients and payors in the dark.  Pinnacle, and later USAP, agreed to bill "patients in the service provider Physician's name" and "provide a telephone number that will be provided on the billing documents.  Calls received at the telephone number will be answered as 'Dallas Anesthesiology Associates' by Pinnacle."  Because of this price-fixing agreement, Plaintiffs and the Class paid more than they otherwise would for hospital-only anesthesia services.

119.   This agreement also enabled USAP to develop a more substantial presence at an important Houston hospital system, thus growing its negotiating leverage with insurers and cementing USAP's monopoly power.

### C.   USAP's Agreement with Baylor College of Medicine

120.   In October 2013, USAP competed for St. Luke's Health with an academic group of fifty anesthesiologists affiliated with Baylor College of Medicine in Houston.  USAP hired Stax to assess that group.  Ultimately, it was not an attractive acquisition target—the group would lose its valuable affiliation with Baylor College of Medicine if USAP acquired it.  Welsh Carson's Regan proposed a different solution: "[I]f Baylor is really pushing for a piece of the anesthesia, get us in a room with them.  Maybe we could work something out that would be mutually beneficial and acceptable to everyone."

121.   That solution came to fruition.  On October 23, 2014, USAP and Baylor College of Medicine entered into an "Anesthesia Services Collaboration Agreement."  Baylor College of Medicine would provide Baylor St. Luke's anesthesia services, and USAP would bill for those services—at higher rates—as if it were the provider and receive all resulting payments.  Because of this price-fixing agreement, Plaintiffs and the Class paid more than they otherwise would have for hospital-only anesthesia services.  USAP faithfully executed this agreement until its termination in 2020.  The pricing authority USAP received

from this agreement was unnecessary; USAP could have provided administrative services without the authority to determine a competitor's prices and has done so at least once.

122. This agreement also enabled USAP to develop a more substantial presence at an important Houston hospital system, thus growing its negotiating leverage with insurers and cementing USAP's monopoly power.

### D. **USAP's Attempted Agreement with a University of Texas Group**

123. USAP also attempted to negotiate a price-fixing agreement with a group of eighty-four anesthesiologists affiliated with the University of Texas. In 2013, USAP first identified an "alliance with UT" as a "significant rate opportunity." The two parties negotiated in June 2014. Term sheets exchanged by the parties suggested that the University of Texas group would assign USAP its exclusive contract with Texas Medical Center. In exchange, USAP would hire the group's physicians as contractors to serve the hospital and then bill payors at USAP's reimbursement rates. USAP and the University of Texas group resumed negotiations in 2020 without success.

124. USAP also attempted to reach a similar agreement with Guardian Anesthesia Service before it acquired that company.

## VI.   **THE FEDERAL TRADE COMMISSION FILES SUIT.**

125.   On September 21, 2023, the Federal Trade Commission ("FTC") filed suit against Welsh Carson and USAP in the United States District Court for the Southern District of Texas.  The FTC complaint alleges substantially the same misconduct as alleged by Plaintiffs here.  It supports those allegations with non-public information about the USAP's acquisitions, reimbursement rates, and anticompetitive agreements.  The FTC seeks a permanent injunction and other equitable relief.

## VII.   **USAP ALSO AGREED TO ALLOCATE A MARKET.**

126.   The FTC complaint also alleges that, in addition to its anesthesiology consolidation strategy and price-fixing agreements, USAP agreed to allocate a market with a potential rival and that the agreement "had the purpose and effect of keeping [redacted]—a significant potential competitor—out of the [redacted] market for anesthesia services."[38]  Because of this market allocation agreement, Plaintiffs and the Class paid more than they otherwise would have for hospital-only anesthesia services.

---

[38] Compl. at ¶ 215, *Fed. Trade Comm'n v. U.S. Anesthesia Partners, Inc.*, No. 4:23-cv-03560 (S.D. Tex. Sept. 21, 2023), ECF No. 1.

## CLASS ACTION ALLEGATIONS

127.   Plaintiffs bring this action as representatives of a class under Rule 23,

Federal Rules of Civil Procedure § 23(b)(2).  Plaintiffs also bring this action as

representatives of a class seeking damages under Rule 23(b)(3).

128.   The Class is defined as follows:

> All entities, not including natural persons, who, on or after four years prior to the filing of this complaint ("the Class Period"), paid for hospital-only anesthesia services provided in Texas by USAP or its co-conspirators.

129.   The following persons and claims are excluded from the Class:

a.   Defendants, including their officers, directors, employees,

subsidiaries, and affiliates; and

b.   Federal and state government entities.

### A.   Numerosity (Rule 23(a)(1))

130.   The Class is so numerous that joinder of all persons in the class is

impracticable.  At minimum, thousands of entities self-fund health insurance for

their employees or members in Texas, in addition to private insurance companies.

### B.   Commonality (Rule 23(a)(2))

131.   There are common questions of law and fact affecting the rights of the

members of the Class, including, without limitation:

132.    Whether USAP's acquisitions substantially lessened competition or tended to create a monopoly in the commercially insured hospital-only anesthesia service in the Austin, Dallas, and Houston; the three-MSA; and Texas markets;

133.    The definition of the relevant markets and whether Defendants wielded pricing power in those markets;

134.    Whether the acquisitions or agreements had anticompetitive effects in the relevant markets;

135.    Whether prices charged by USAP and its co-conspirators for hospital-only anesthesia services were artificially inflated as a result of the acquisitions or agreement;

136.    Whether, and to what extent, Defendants' conduct caused injury to Plaintiffs and the Class;

137.    Whether the alleged conduct violated the Clayton Act;

138.    Whether the alleged conduct violated the Sherman Act;

139.    What injunctive and other equitable relief is appropriate; and

140.    What class-wide measure of damages is appropriate.

**C.    Typicality (Rule 23(a)(3))**

141.    The claims of the named class representatives are typical of the claims of the proposed Class.  Plaintiffs and all members of the proposed Class sustained the same or similar injuries arising out of and caused by Defendants' common

course of conduct in violation of applicable Federal law, in that each Plaintiff and Class member paid artificially inflated prices as a result of the acquisitions and agreements.

### D.    Adequacy (Rule 23(a)(4) and 23(g))

142.    The named representatives will fairly and adequately protect the interests of the proposed Class.  There are no conflicts between the named Class representatives and the other members of the proposed Class.

### E.    Rule 23(b)(2)

143.    This action is maintainable as a class action under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate, injunctive, and other equitable relief in favor of the Class.

### F.    Rule 23(b)(3)

144.    Questions of law and fact common to the Class members, including legal and factual issues relating to violation and damages, predominate over any questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class.

145.    Class treatment offers a superior method for the fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary

duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in managing this class action.

<u>**VIOLATIONS**</u>

<u>**COUNT ONE**</u>

<u>**Monopolization**</u>
<u>**Section Two of the Sherman Act**</u>

146.   Plaintiffs incorporate the above paragraphs as though fully set forth herein.

147.   Defendants' anticompetitive conduct set forth in this Complaint has violated Section Two of the Sherman Act.  *See* 15 U.S.C. § 2.

148.   USAP has monopoly power in the Austin, Dallas, and Houston; three-MSA; and Texas markets for commercially insured hospital-only anesthesia services.

149.   Welsh Carson and USAP willfully acquired that monopoly by engaging in anticompetitive acquisitions of at least sixteen anesthesiology groups across Texas.  With each acquisition, USAP's negotiating leverage with insurers grew and enabled it to charge supra-competitive prices for services in the Austin, Dallas, and Houston; three-MSA; and Texas markets, just as Defendants intended.

150.   Defendants' monopolization of the Austin, Dallas, and Houston; three-MSA; and Texas markets for commercially insured hospital-only anesthesia services occurred in or affected interstate commerce.

151.   As a result of Defendants' monopolization, Plaintiffs and the Proposed Class have suffered, and will continue to suffer, an antitrust injury because they paid, and will continue to pay, higher prices for hospital-only anesthesia service than they otherwise would have.

152.   Pursuant to Section Four of the Clayton Act, 15 U.S.C. § 15, Plaintiffs seek to recover treble damages and other relief prayed for below.

## COUNT TWO

### Unlawful Acquisition
### Section Seven of the Clayton Act

153.   Plaintiffs incorporate the above paragraphs as though fully set forth herein.

154.   Defendants' anticompetitive conduct set forth in this Complaint has violated Section Seven of the Clayton Act.  *See* 15 U.S.C. § 18.

155.   USAP and Welsh Carson devised a strategy to substantially lessen competition for hospital-only anesthesia in the Austin, Dallas, and Houston; three-MSA; and Texas markets.  Defendants executed that strategy by acquiring at least sixteen anesthesiology groups across Texas.  Those acquisitions were horizontal—USAP competed with the acquired practices in the Austin, Dallas, and Houston;

- 62 -

three-MSA; and Texas markets for hospital-only anesthesia. With each acquisition, USAP's negotiating leverage with insurers grew and enabled it to charge supra-competitive prices for services in the Austin, Dallas, and Houston; three-MSA; and Texas markets, just as Defendants intended. This substantially lessened competition for anesthesia services in those markets.

156.   The threat of new entry has not prevented Defendants from substantially lessening competition because significant barriers to entry exist.

157.   Defendants' strategy to substantially lessen competition in the Austin, Dallas, and Houston; three-MSA; and Texas markets for commercially insured hospital-only anesthesia services occurred in or affected interstate commerce.

158.   As a result of Defendants' several anticompetitive acquisitions, Plaintiffs and the Proposed Class have suffered, and will continue to suffer, an antitrust injury because they paid, and will continue to pay, higher prices for hospital-only anesthesia service than they otherwise would have.

159.   Pursuant to Section Four of the Clayton Act, 15 U.S.C. § 15, Plaintiffs seek to recover treble damages and other relief prayed for below.

## COUNT THREE

### Conspiracy to Monopolize
### Section Two of the Sherman Act

160.   Plaintiffs incorporate the above paragraphs as though fully set forth herein.

161.   Defendants' conspiracy to monopolize commercially insured hospital-only anesthesia services in the Austin, Dallas, and Houston; three-MSA; and Texas markets set forth in this Complaint has violated Section Two of the Sherman Act. *See* 15 U.S.C. § 2.

162.   USAP and Welsh Carson knowingly entered into an agreement, understanding, or conspiracy to monopolize commercially insured hospital-only anesthesia services in the Austin, Dallas, and Houston; three-MSA; and Texas markets.  Defendants committed numerous overt acts in furtherance of this conspiracy and had the specific intent to obtain monopoly power for USAP.

163.   USAP and Welsh Carson's conspiracy to monopolize commercially insured hospital-only anesthesia services in the Austin, Dallas, and Houston; three-MSA; and Texas markets occurred in or has had an effect on interstate commerce.

164.   Neither USAP nor Welsh Carson has withdrawn from their conspiracy to monopolize the commercially insured hospital-only anesthesia services in the Austin, Dallas, and Houston; three-MSA; and Texas markets.

165.   As a result of Defendants' conspiracy to monopolize, Plaintiffs and the Proposed Class have suffered, and will continue to suffer, an antitrust injury because they paid, and will continue to pay, higher prices for hospital-only anesthesia service than they otherwise would have.

166.   Pursuant to Section Four of the Clayton Act, 15 U.S.C. § 15, Plaintiffs seek to recover treble damages and other relief prayed for below.

## COUNT FOUR

### Attempted Monopolization
### Section Two of the Sherman Act

167.   Plaintiffs incorporate the above paragraphs as though fully set forth herein.

168.   Defendants' anticompetitive conduct set forth in this Complaint has violated Section Two of the Sherman Act.  *See* 15 U.S.C. § 2.

169.   Defendants attempted to monopolize the Austin, Dallas, and Houston; three-MSA; and Texas markets for commercially insured hospital-only anesthesia services.

170.   Defendants attempted to monopolize these markets by engaging in anticompetitive acquisitions of at least sixteen anesthesiology groups across Texas. With each acquisition, Defendants intended to increase USAP's negotiating leverage with insurers so it could charge supra-competitive prices.

171.   Defendants had the specific intent to achieve monopoly power for USAP in the Austin, Dallas, and Houston; three-MSA; and Texas markets for commercially insured hospital-only anesthesia services.

172.   There was a dangerous probability that the Defendants would achieve their goal of obtaining monopoly power for USAP in those markets for commercially insured hospital-only anesthesia services.

173.   Defendants' attempt to monopolize the commercially insured hospital-only anesthesia services in the Austin, Dallas, and Houston; three-MSA; and Texas markets occurred in or had an effect on interstate commerce.

174.   As a result of Defendants' attempted monopolization, Plaintiffs and the Proposed Class have suffered, and will continue to suffer, an antitrust injury because they paid, and will continue to pay, higher prices for hospital-only anesthesia service than they otherwise would have.

175.   Pursuant to Section Four of the Clayton Act, 15 U.S.C. § 15, Plaintiffs seek to recover treble damages and other relief prayed for below.

## COUNT FIVE

### Horizontal Agreements to Fix Prices
### Section One of the Sherman Act

176.   Plaintiffs incorporate the above paragraphs as though fully set forth herein.

177.   Defendants' anticompetitive conduct set forth in this Complaint has violated Section One of the Sherman Act.  *See* 15 U.S.C. § 1.

178.   Defendants' agreements to fix prices with Methodist Hospital Physician Organization, Dallas Anesthesiology Associates, and the Baylor College

of Medicine had the purpose and effect of restraining competition in the Austin, Dallas, and Houston; three-MSA; and Texas markets for commercially insured hospital-only anesthesia services.  By entering or maintaining these agreements, Defendants were able to profitably maintain prices in the relevant market substantially above what they would have been able to charge absent the agreements.

179.   During the agreements, USAP had, and will continue to have, substantial market power in the Austin, Dallas, and Houston; three-MSA; and Texas markets for commercially insured hospital-only anesthesia services.

180.   As a result of Defendants' agreements to fix prices, Plaintiffs and the Proposed Class have suffered, and will continue to suffer, an antitrust injury because they paid, and will continue to pay, higher prices for hospital-only anesthesia services than they otherwise would have.

181.   Defendants' agreement occurred in or had an effect on interstate commerce.

182.   Defendants did not engage in these agreements for any pro-competitive purpose.  Nor do Defendants' agreements have any pro-competitive effects.  The agreements' actual and likely anticompetitive effects outweigh any arguable benefits.

183.   Defendants' agreements to fix prices for commercially insured hospital-only anesthesia services in the Austin, Dallas, and Houston; three-MSA; and Texas markets set forth in this Complaint have violated Section One of the Sherman Act.  *See* 15 U.S.C. § 1.

184.   Pursuant to Section Four of the Clayton Act, 15 U.S.C. § 15, Plaintiffs seek to recover treble damages and other relief prayed for below.

## COUNT SIX

### Horizontal Agreement to Divide Market
### Section One of the Sherman Act

185.   Plaintiffs incorporate the above paragraphs as though fully set forth herein.

186.   Defendants' anticompetitive conduct set forth in this Complaint has violated Section One of the Sherman Act.  *See* 15 U.S.C. § 1.

187.   Defendants' agreement with a potential competitor not to enter a market for commercially insured hospital-only anesthesia services in exchange for consideration had the purpose and effect of restraining competition in that market. Welsh Carson controlled, directed, or dictated USAP to form and execute that agreement.  Through this agreement, Defendants profitably maintained prices in the relevant market substantially above what they would have been able to charge absent the agreement.

188.   During the agreement, USAP had, and will continue to have, substantial market power.

189.   As a result of Defendants' agreements to allocate the market, Plaintiffs and the Proposed Class have suffered, and will continue to suffer, an antitrust injury because they paid, and will continue to pay, higher prices for hospital-only anesthesia service than they otherwise would have.

190.   Defendants' agreement occurred in or had an effect on interstate commerce.

191.   Defendants did not engage in this agreement for any pro-competitive purpose.  Nor does Defendants' agreement have any pro-competitive effects.  The agreement's actual and likely anticompetitive effects outweigh any arguable benefits.

192.   Defendants' market allocation agreement set forth in this Complaint has violated Section One of the Sherman Act.  *See* 15 U.S.C. § 1.

193.   Pursuant to Section Four of the Clayton Act, 15 U.S.C. § 15, Plaintiffs seek to recover treble damages and other relief prayed for below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully pray for the following relief:

A.      An order certifying the action as a class action pursuant to Federal Rule of Civil Procedure 23, and appointing Plaintiffs as the representatives of the Class, and appointing their counsel as Class Counsel;

B.      An order declaring that Defendants' acquisitions were an unlawful merger of assets in violation of the federal statutes cited herein;

C.      An order declaring that Defendants' price-setting and market allocation agreements are unlawful restraints of trade, in violation of the federal statutes cited herein;

D.      An injunction enjoining Defendants' transactions and requiring them to divest assets sufficient to restore competition for commercially insured hospital-only anesthesia service in the relevant market to the extent it existed before Defendants' scheme;

E.      Treble damages to members of the Class, for their payments of inflated hospital-only anesthesia services provided by USAP or its co-conspirators;

F.      Equitable relief in the form of restitution or disgorgement of all unlawful or illegal profits received by Defendants as a result of the anticompetitive conduct alleged herein;

G.      The costs of bringing this suit, including reasonable attorneys' fees;

H.      An award of pre-and post-judgment interest, to the extent allowable; and

I.     Such other further relief that the Court deems reasonable and just.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs Electrical Medical

Trust and Plumbers Local Union No. 68 Welfare Fund hereby demand a trial by

jury.


Dated: November 20, 2023          Respectfully submitted,


*/s/ Nimish Desai*
Nimish Desai (TX Bar No. 24105238)
Brendan P. Glackin (CA Bar No. 199643)
Attorney-In-Charge
Lin Y. Chan (CA Bar No. 255027)
Jules Ross (CA Bar No. 348368)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Phone: (415) 956-1000
Fax: (415) 956-1008
ndesai@lchb.com
bglackin@lchb.com
lchan@lchb.com
jross@lchb.com

*Counsel for Plaintiffs and the Proposed Class*