IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ELECTRICAL MEDICAL TRUST, et al., | § § | |
| Plaintiffs, | § § | CIVIL ACTION NO.: 4:23-CV-04398 |
| vs. | § § | **ORAL ARGUMENT REQUESTED** |
| U.S. ANESTHESIA PARTNERS, INC., et al., | § § | |
| Defendants. | § § | |

**REPLY IN SUPPORT OF DEFENDANT U.S. ANESTHESIA PARTNERS, INC.'S
MOTION TO DISMISS THE COMPLAINT**

Plaintiffs' opposition confirms the fatal deficiencies of this lawsuit that USAP's motion identified. To begin with, Plaintiffs lack standing under *Illinois Brick*: they concede (at 9) that "the insurer pays the claims," and that ends the standing inquiry. Plaintiffs' claims also contort antitrust law in several respects and would set precedents for, among other things: a market definition that excludes doctors of the same specialty; monopolization claims based solely on acquisitions without supracompetitive prices to follow; and a price-fixing claim without any agreement on prices. The Court should dismiss Plaintiffs' complaint.

**ARGUMENT**

**I.    PLAINTIFFS LACK STANDING TO SUE AS INDIRECT PURCHASERS**

Plaintiffs fail to overcome USAP's showing (Mot. at 8-11) that their direct-purchaser allegations are legally insufficient. Plaintiffs concede the key point that it is the insurer – not Plaintiffs – that "pays the claims as they are submitted by the providers." Opp. at 9 (citing *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 189 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017)). Under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and its progeny, like *In re NorthShore Univ. HealthSystem Antitrust Litig.*, 2018 WL 2383098 (N.D. Ill. Mar. 31, 2018), Plaintiffs are not direct purchasers because "the *direct* victim of antitrust harm is [the insurer], not"

the self-funded payer. *NorthShore*, 2018 WL 2383098, at *8 (emphasis added). Plaintiffs do not and cannot allege that they *directly* "paid USAP for hospital anesthesia services provided to its plan participants." Compl. ¶¶ 14-15. They therefore do not have standing. *See, e.g., In re Surescripts Antitrust Litig.*, 2020 WL 4905692, at *4 (N.D. Ill. Aug. 19, 2020) ("If the plaintiffs paid Surescripts directly for e-prescription routing services, they need only say so to render the *Illinois Brick* doctrine irrelevant."). The cases Plaintiffs cite prove the point. In both *City of Miami v. Eli Lilly & Co.* and *City of Pontiac v. Blue Cross Blue Shield of Michigan*, the plaintiff cities *did* "make purchases from" the defendants, unlike here. 2022 WL 198028, at *3 (S.D. Fla. Jan. 21, 2022); 2012 WL 1079885, at *7 (E.D. Mich. Mar. 30, 2012). Similarly, in *Apple Inc. v. Pepper*, the "plaintiffs purchased apps directly from Apple." 139 S. Ct. 1514, 1519 (2019).

Plaintiffs retreat to arguing that *NorthShore* was wrongly decided, but *NorthShore* correctly recognized that *direct* purchaser standing extends only to those that pay an alleged antitrust violator *directly*, and looked to the contract governing payment to identify that party. *See* 2018 WL 2383098 at *7 ("[I]t is BCBS that must pay NorthShore, and nothing in the contract suggests that NorthShore can go after an entity like Painters Fund if there is ever a shortfall in payment."). *Blue Shield of Virginia v. McCready* is irrelevant to the *Illinois Brick* issue because, as the Supreme Court explicitly held, the case was about "Blue Shield's failure to pay [plaintiff]" directly, and *not* about the plaintiff overpaying a provider. 457 U.S. 465, 475 (1982). Regardless, decisions that long post-date *McCready* reflect the same focus on "the mechanics of the transaction" as the cases noted above. *See* Mot. at 8-10 (citing, *e.g.*, *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 88 (3d Cir. 2011)).

Plaintiffs assert in the alternative (at 12-14) that their contracts are "the functional equivalent of a 'cost plus' contract," relying on *In re Beef Industry Antitrust Litigation*, 600 F.2d

2

1148 (5th Cir. 1979). It is unclear whether that decision remains good law. *See*, *e.g.*, *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996) (questioning the continued viability of the cost-plus exception to *Illinois Brick*). But even if it does, Plaintiffs fall far short of pleading that they fall within any cost-plus exception. As the Fifth Circuit held on summary judgment in *Beef* itself, the cost-plus exception requires "absolute certainty as to the application and the amount of the pass-on," such that "[i]ndividual transactions do not have to be weighed to measure whether and to what extent the pass-on occurred." 710 F.2d 216, 220 (5th Cir. 1983) (affirming grant of summary judgment). Plaintiffs allege nothing of the kind here. Courts regularly reject similar fallback cost-plus arguments in healthcare cases. *See*, *e.g.*, *Glynn-Brunswick Hosp. Auth. v. Becton*, 159 F. Supp. 3d 1361, 1374 (S.D. Ga. 2016). This Court should do the same.

## II. THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE A RELEVANT PRODUCT MARKET

Plaintiffs' claims depend on their asserted market for "hospital-only anesthesia services reimbursed by commercial payors." Compl. ¶ 25. But as USAP explained (Mot. at 11-13), that proposed market implausibly excludes physicians (as well as CRNAs and CAAs) that perform identical services and could perform them in hospitals if USAP were to raise its prices above competitive levels. Plaintiffs offer no compelling response.

Contrary to Plaintiffs' suggestion (at 14), no black-letter principle bars the Court from dismissing the case on that ground now. As the Fifth Circuit and many other courts have recognized, a plaintiff cannot state an antitrust claim if the pleaded market arbitrarily excludes potential substitutes. *See*, *e.g.*, *New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1038 (5th Cir. 2023) (affirming dismissal of antitrust complaint because market did not include "reasonably interchangeable substitutes" and thus was "unduly narrow and legally insufficient"); *see also Apani Sw., Inc. v. Coca-Cola Enters.*,

3

*Inc.*, 300 F.3d 620, 628 (5th Cir. 2002) (affirming dismissal on the pleadings); *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1338 (11th Cir. 2010); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-47 (3d Cir. 1997).

On the merits, Plaintiffs do not claim that the anesthesia services provided to hospitalized patients inherently differ from those provided to patients in other settings. Plaintiffs instead reiterate the obvious (at 15): patients who must be hospitalized must receive anesthesia services in a hospital. But Plaintiffs fail to connect this tautology about *physicians'* treatment of *patients* to the market-definition question that matters on its theory of competitive harm: whether, when *USAP* negotiates with *insurers*, competition from non-hospital anesthesiologists constrains USAP's "ability to raise prices above the competitive level." *Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F. App'x 23, 28 (2d Cir. 2015) (citation omitted); *see also Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1274 (9th Cir. 1975) (setting aside market definition as legally erroneous because the district court had misidentified the relevant buyers and sellers).

Plaintiffs chastise USAP (at 15) for ignoring the "obvious" reality that, for example, a "gunshot victim in the emergency room cannot be rolled over to the office of an [outpatient] anesthesiologist." But by Plaintiffs' logic, every individual hospital would be a market of its own, since the gunshot victim can no more "be rolled over" to a different hospital in the next county than the outpatient clinic next door. Plaintiffs are incorrect because an antitrust market is defined "not only . . . by current substitutes but also by actual or potential competitors capable of providing new competition quickly with little sunk costs." *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 499 (2d Cir. 2004).

The Second Circuit's recent decision in *Regeneron Pharms. Inc. v. Novartis Pharma AG*,

4

2024 WL 1145340 (2d Cir. Mar. 18, 2024), which Plaintiffs cite as supplemental authority in support of their market-definition proposal, *see* ECF 68, confirms these principles and supports USAP. The *Regeneron* panel held that "the applicable analysis [for market-definition questions] is whether or not the products are *economic* substitutes, not whether they appear to be functionally similar." *Id.* at *8 (emphasis in original). That is the precise conceptual error that Plaintiffs' own market definition reflects, focusing as it does on the *functional* attributes of "hospital-only" anesthesia providers while ignoring the *economic* constraints posed by clinicians that happen to practice in other settings but could easily replace them. Because Plaintiffs' approach does not account for the ability of non-hospital anesthesiologists to replace USAP's clinicians if it attempts to impose supracompetitive prices, their market definition fails and their claims require dismissal.

Finally, Plaintiffs assert (at 15-17) a smattering of alleged differences between hospitals and other types of facilities, including that: (1) insurers use separate billing codes for hospital anesthesia; (2) some hospitals enter into exclusive contracts with a single anesthesiology practice; and (3) USAP has taken note of such contracts (or the opportunity to obtain them) in evaluating potential acquisitions. But while such "practical indicia" may be relevant to determining the "boundaries of . . . a submarket," that is only true where there is already a product market "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). As explained above, that is not the case here, and Plaintiffs allege no facts showing that these additional proposed points of *differentiation* also constitute boundaries of *competition*.

**III.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 2 OF THE SHERMAN ACT**

A claim under Section 2 of the Sherman Act has two elements: *first*, the "possession of monopoly power," and *second*, "anticompetitive conduct," which is "the use of monopoly power

5

to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 529 (5th Cir. 2022) (quoting *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 482-83 (1992)). As USAP's motion explained, Plaintiffs' allegations of USAP's monopoly power are implausible (Mot. at 14-18), and the complaint fails to allege any cognizable anticompetitive conduct by USAP at all (*id.* at 19-21).

### A. The Complaint Fails To Plausibly Allege That USAP Has Monopoly Power

**1.** Plaintiffs argue (at 18-20) that the complaint pleads both "circumstantial evidence" and "direct evidence" of USAP's monopoly power. But the "circumstantial evidence" – USAP's purported share of the Texas market for "hospital-only anesthesia services reimbursed by commercial payors" – depends on the impermissibly gerrymandered market definition described above. And Plaintiffs' "direct evidence" of USAP's purportedly supracompetitive prices – a series of conclusory statements that USAP's prices were "artificially inflated" and higher than the average rates of other Texas anesthesiology practices – fails plausibly to allege that USAP's rates were "above the competitive level," *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 335 (5th Cir. 2015). More fundamentally, Plaintiffs fail in their opposition to address the point that other allegations on the face of the complaint, and judicially noticeable facts, affirmatively contradict the claim of USAP's monopoly power. As USAP explained (Mot. at 14-18), Plaintiffs' own allegations regarding USAP's pricing practices, as well as the regulatory context in which USAP operates, render the claim that USAP has monopoly power implausible and defeat the "inference" that Plaintiffs urge this Court (at 18) to draw.

**2.** Plaintiffs direct the Court (at 19) to conclusory allegations from the complaint that USAP charged "artificially inflated" prices, exercised "leverage," and "had a greater ability to impose higher prices" than other practices. But the *facts* alleged in the complaint contradict the *conclusions* that Plaintiffs assert. The complaint describes "a series of 'tuck-in acquisitions'"

6

whereby USAP acquired several smaller anesthesiology practices and then "raise[d] the new practitioners' reimbursement rates to those of Greater Houston Anesthesiology" (as negotiated prior to its acquisition by USAP). Compl. ¶ 57. And the complaint makes clear that when USAP acquired GHA in December 2012, GHA had less than a 15% share of even Plaintiffs' artificial market for "hospital-only anesthesia services." *See id.* ¶ 87. Plaintiffs' own allegations therefore establish that the purportedly "inflated" prices cannot have been an exercise of monopoly power, because those prices were set by an entity (GHA) that concededly lacked market power altogether.

Plaintiffs accuse USAP (at 19) of "re-writing the complaint," but the above syllogism comes straight from Plaintiffs' own allegations. Casting around for a rebuttal to their own narrative, Plaintiffs cling to a throwaway phrase from an introductory paragraph of the complaint: "After each acquisition, USAP has raised the target's prices to Greater Houston Anesthesiology's higher reimbursement rate *and continued to increase prices* . . . ." Compl. ¶ 8 (emphasis added). But that conclusory clause has no well-pleaded facts to support it. Among other problems, Plaintiffs nowhere allege that Plaintiffs' purported price increases even exceeded the rate of inflation, let alone growth in other inputs such as labor or supply costs. Plaintiffs thus have alleged, at most, that USAP increased prices *to* the competitive level – not *above* it.[1]

**3.** USAP's motion also explained (at 16-18) how the federal No Surprises Act and its Texas equivalent – which prohibit out-of-network providers from "balance billing" their patients and require mandatory arbitration of disputed rates – preclude any exercise of monopoly power by USAP. Plaintiffs note (at 23) that the federal Act went into effect on January 1, 2022. But the Texas equivalent was enacted in June 2019, and the statute of limitations precludes liability for

---

[1] Plaintiffs' single-sentence assertion (at 20) "that defendants sacrificed quality" fails for similar reasons: isolated instances of physician malpractice do not constitute a well-pleaded allegation that the quality of anesthesiology services has fallen below the competitive level.

conduct committed prior to that date. *See* 15 U.S.C. § 15b. Contrary to Plaintiffs' objection (at 23-24), USAP's argument does not require judicial notice of the law's effect on provider-payor negotiations. The text of the relevant provisions withdraws the only meaningful leverage that USAP could assert: to go "out of network" and "balance bill" patients at USAP's preferred rate.

Plaintiffs misconstrue USAP's argument (at 24) by equating it to implied antitrust immunity for all healthcare providers subject to the No Surprises Act. Other antitrust claims, such as those under Section 1 of the Sherman Act or Section 7 of the Clayton Act, have different elements. But the No Surprises Act does render covered healthcare providers unable to exercise *monopoly power*, as a claim under *Section 2* of the Sherman Act requires, since payors are expressly insulated from the exercise of such power by the statute's provisions.

**B.     The Complaint Fails To Plausibly Allege Anticompetitive Conduct**

The "second element" of a Section 2 claim is "anticompetitive (or 'exclusionary') conduct." *BRFHH*, 49 F.4th at 529.[2] "Anticompetitive conduct is 'the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *BRFHH*, 49 F.4th at 529 (quoting *Eastman Kodak*, 504 U.S. at 482-83). Plaintiffs argue (at 20-23) that a series of acquisitions that results in a company having higher market share, without more, can satisfy this element. But Plaintiffs' argument proves too much: every horizontal merger increases market share, but obviously not every horizontal merger results in harm to competition. Indeed, "horizontal mergers are much more likely to be procompetitive than anticompetitive." *See Dresses for Less, Inc. v. CIT Grp./Com. Servs.*, 2002 WL 31164482, at *12 (S.D.N.Y. Sept. 30, 2002). Existing law requires more to make out a Section 2 claim: "[t]he illegal abuse of power occurs when the monopolist exercises its power to control prices or exclude competitors from the relevant

---

[2] Plaintiffs (at 22) quibble over the difference between "anticompetitive" and "exclusionary" conduct, but as the statement from *BRFHH* suggests, the terms are interchangeable.

market for its products." *Abraham*, 776 F.3d at 334.

Plaintiffs invoke historical Section 2 cases that they characterize as finding illegality based on acquisitions alone. But each of these cases involved some element of anticompetitive conduct beyond the acquisitions. *See*, *e.g.*, *United States v. Am. Tobacco Co.*, 221 U.S. 106, 183 (1911) (defendant spent "millions upon millions of dollars in buying out plants, not for the purpose of utilizing them, but in order to close them up and render them useless"). Under the law as it actually stands, "plaintiffs cannot rely on the fact of the acquisitions alone." *Eastman v. Quest Diagnostics*, 2016 WL 1640465, at *9 (N.D. Cal. Apr. 26, 2016), *aff'd*, 724 F. App'x 556 (9th Cir. 2018).

### C. Plaintiffs' Section 2 Conspiracy Claim Independently Requires Dismissal

As explained in Defendants' opening briefs, and in Welsh Carson's reply, Plaintiffs' Section 2 conspiracy claim independently fails because USAP and Welsh Carson are legally incapable of conspiring under *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 770-71 (1984). *See* USAP Mot. Section III.C; WC Mot. Section II.A.1; WC Reply Sections I, II.B. Count III of the complaint should be dismissed on this additional ground.

### IV. THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 7 OF THE CLAYTON ACT

The Complaint fails to state a Section 7 claim for the reasons already discussed. But the record of the years since these acquisitions closed also belies any notion that the effect of the acquisitions "may be substantially to lessen competition." 15 U.S.C. § 18. Section 7 requires a showing of "anticompetitive *results* flowing from the challenged merger or acquisition." *David B. Turner Builders LLC v. Weyerhaeuser Co.*, 603 F. Supp. 3d 459, 466 (S.D. Miss. 2022) (emphasis added), *aff'd*, 2023 WL 2401587 (5th Cir. Mar. 8, 2023). Plaintiffs' Section 7 claim addresses long-past acquisitions, and Plaintiffs have conspicuously failed to allege *any* "anticompetitive results" in the years since they closed.

## V. THE COMPLAINT FAILS TO STATE A PRICE-FIXING CLAIM UNDER SECTION 1 OF THE SHERMAN ACT

Plaintiffs' Section 1 claim should be dismissed because the agreements they describe are not agreements to engage in "price-fixing." Unlike agreements between competitors not to compete, the agreements Plaintiffs describe are fundamentally vertical – they are between firms playing different, complementary roles within a market. As alleged, the anesthesiologists at the three relevant hospitals care for their patients, and USAP provides the back-office, administrative services necessary for those doctors to get reimbursed. Vertical arrangements like these are presumptively procompetitive and subject to antitrust scrutiny only under the Rule of Reason. *See*, *e.g.*, *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2285 (2018). But Plaintiffs make no argument that they can prevail under that standard.

## CONCLUSION

The Court should dismiss Plaintiffs' complaint in its entirety.

| | |
|---|---|
| Dated: March 26, 2024 | Respectfully submitted, |
| | /s/ *Mark C. Hansen* |
| David J. Beck (TX Bar No. 00000070) | Mark C. Hansen* (D.C. Bar No. 425930) |
| (Federal I.D. No. 16605) | Attorney-in-Charge |
| Garrett S. Brawley (TX Bar No. 24095812) | Geoffrey M. Klineberg* (D.C. Bar No. 444503) |
| (Federal I.D. No. 3311277) | David L. Schwarz* (D.C. Bar No. 471910) |
| BECK REDDEN LLP | Kevin J. Miller* (D.C. Bar No. 478154) |
| 1221 McKinney Street, Suite 4500 | Collin R. White* (D.C. Bar No. 1031005) |
| Houston, TX 77010 | Dennis D. Howe* (D.C. Bar No. 90011114) |
| Tel: (713) 951-3700 | Derek C. Reinbold (D.C. Bar. No. 1656156) |
| Fax: (713) 951-3720 | (*pro hac vice* application pending) |
| | KELLOGG, HANSEN, TODD, |
| | FIGEL & FREDERICK, P.L.L.C. |
| | 1615 M Street N.W., Suite 400 |
| | Washington, D.C. 20036 |
| | Tel: (202) 326-7900 |
| | Fax: (202) 326-7999 |
| | *Admitted *Pro Hac Vice* |

*Counsel for Defendant U.S. Anesthesia Partners, Inc.*

## CERTIFICATE OF CONFERENCE

On February 13, 2024, counsel for the U.S. Anesthesia Partners, Inc. conferred with Plaintiffs' counsel by phone and by email regarding this motion. Plaintiffs are opposed to the relief requested herein.

/s/ *Mark C. Hansen*
Mark C. Hansen

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2024, I filed the foregoing document with the Court and served it on opposing counsel through the Court's CM/ECF system. All counsel of record are registered ECF users.

/s/ *Mark C. Hansen*
Mark C. Hansen