United States District Court
Southern District of Texas
**ENTERED**
September 27, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ELECTRICAL MEDICAL TRUST, *et al.*, § | |
| § | |
| Plaintiffs, § | |
| § | |
| VS. § | CIVIL ACTION NO. 4:23-CV-04398 |
| § | |
| U.S. ANESTHESIA PARTNERS, INC., *et* § | |
| *al.*, § | |
| § | |
| Defendants. § | |

## <u>ORDER</u>

Before the Court are (1) Defendants Welsh, Carson, Anderson & Stowe XI, L.P., WCAS

Associates XI, LLC, Welsh, Carson, Anderson & Stowe XII, L.P., WCAS Associates XII, LLC,

WCAS Management Corporation, WCAS Management, L.P., and WCAS Management, LLC's

(collectively, "Welsh Carson") Motion to Dismiss (Doc. #49) and (2) Defendant U.S. Anesthesia

Partners, Inc.'s ("USAP") Motion to Dismiss (Doc. #50) (collectively, the "Motions to Dismiss").

The Court heard oral arguments on the Motions to Dismiss on September 5, 2024. Having

considered the parties' arguments and the applicable legal authority, the Court grants Welsh

Carson's Motion to Dismiss and grants USAP's Motion to Dismiss in part.

**I.      Background**

**a.      Factual Background**

This class action lawsuit arises out of an alleged multi-year anticompetitive scheme

perpetrated by USAP and Welsh Carson to monopolize hospital anesthesia services in Texas. Doc.

#1 ¶ 1. Welsh Carson, a private equity firm, helped create USAP, a physician services organization

that offers anesthesiology services. *Id.* ¶¶ 1–2. Plaintiffs Electrical Medical Trust and Plumbers

Local Union No. 68 Welfare Fund (collectively, "Plaintiffs") are self-funded employee benefit plans that "directly reimburse[] healthcare providers who treat [their] members" and paid USAP for hospital anesthesia services. Doc. #1 ¶¶ 14–15. According to Plaintiffs, they—and the proposed class—have been harmed by Welsh Carson and USAP's alleged misconduct by paying higher prices for hospital anesthesia services than they otherwise would have. *Id.* ¶ 10.

### 1.  The Hospital Anesthesia Market

First, some background on the hospital anesthesia market is in order.  While medical providers can provide anesthesia services in several healthcare settings, this case concerns "hospital-only anesthesia services" that are "reimbursed by commercial payors." *See id.* ¶¶ 25–27. Hospital-only anesthesia services include inpatient and outpatient anesthesia services that must be provided in a hospital because the patient may require emergency medical services only available at a hospital. *Id.* ¶ 25.  To provide hospital-only anesthesia services, hospitals can choose to employ their own anesthesiologists or, as relevant here, partner exclusively with anesthesia groups like USAP. *See id.* ¶ 39.

In the private insurance market, individual patients seeking healthcare generally choose among doctors and facilities based on proximity to where they live, but do not strongly consider price. *Id.* ¶ 33.  This is because, subject to co-pays, individuals usually do not pay out-of-pocket for most treatments. *Id.*  Instead, individuals typically pay for their insurance through their employer or labor union, which in turn pay healthcare providers. *Id.*  Thus, commercial insurers build provider "networks" by contracting with provider groups, and self-funded insurers often contract with commercial insurers for access to those networks. *Id.*

The rates at which anesthesia provider groups are paid depends on what type of entity is paying.  For instance, government insurers pay rates set forth in government fee schedules. *Id.* ¶

2

31–32.  On the other hand, "commercial payors" pay rates set forth in the contracts negotiated between insurers and anesthesia groups.  *Id.*  In negotiating these rates, the insurers' "main leverage . . . is the threat of network exclusion."  *Fed. Trade Comm'n v. U.S. Anesthesia Partners, Inc.*, No. 4:23-CV-03560, 2024 WL 2137649, at \*1 (S.D. Tex. May 13, 2024).  However, insurers also have an incentive to maintain a network of providers in a broad geographic area.  Doc. #1 ¶ 34.  Thus, the larger the geographic scope that a provider group operates in, the more difficult it is for an insurer to exclude that group from its network.  *Id.*  In other words, "[i]f a group grows so large that it becomes indispensable, the threat of network removal loses its bite[.]"  *Fed. Trade Comm'n*, 2024 WL 2137649, at \*1.

### 2.  Welsh Carson and USAP

In early 2012, John Rizzo ("Rizzo"), a former executive at a large national anesthesia group, contacted Welsh Carson seeking investors for a new anesthesia practice that ultimately became USAP.  *Id.* ¶ 48.  Rizzo began working with Welsh Carson partner Brian Regan ("Regan") to get Welsh Carson investors on board.  *Id.* ¶ 49.  Rizzo and Regan explained that USAP's goal was to build a nationwide presence by consolidating the hospital anesthesia market in certain key areas, including Texas.  *Id.*  After Rizzo and Regan pitched this concept, Welsh Carson agreed to provide start-up capital, help "develop a market roadmap," and conduct due diligence on "acquisition candidates."  *Id.* ¶¶ 49–50.  Specifically, Defendant Welsh, Carson, Anderson & Stowe XI, L.P. ("Fund XI")—an investment fund—provided the investment capital, at which time it acquired a 50.2% interest in USAP and therefore "formally controll[ed]" the company.  *Id.* ¶¶ 19–20, 55.  Welsh Carson also maintained the authority to fill a majority of USAP's Board of Directors (the "Board").  *Id.* ¶¶ 19–21.  On November 19, 2012, USAP's formation was officially announced.  *Id.* ¶ 56.  Welsh Carson then hired USAP's CEO, CFO, COO, and head of Human

3

Resources. *Id.* ¶ 22. All of these positions were filled by individuals that had previously worked for other Welsh Carson companies. *Id.*

Shortly after USAP was officially formed, Welsh Carson helped it acquire Greater Houston Anesthesiology ("GHA")—an anesthesiology provider group in Houston that was "20 times the size of the second largest local competitor." *Id.* ¶¶ 52, 56. After this first acquisition, USAP sought out other anesthesia practices that already held exclusive contracts with major hospitals. *Id.* ¶ 57. Thereafter, USAP went on to acquire fifteen other anesthesia practices in Texas. *Id.* ¶¶ 60–82. Each time, USAP increased the providers' reimbursement rates to match GHA's higher rates. *Id.* Most of these acquisitions occurred between 2012 and 2018, including USAP's acquisition of Pinnacle Anesthesia Consultants ("Pinnacle") in 2013. *Id.* In September 2019, USAP acquired Star Anesthesia ("Star"), and in January 2020, USAP acquired Guardian Anesthesia Services ("Guardian"). *Id.* ¶¶ 81–82. USAP's acquisitions steadily increased its Texas market share. In 2019, USAP achieved 50% market share in Texas, which rose to a high of 60% in 2020. *Id.* ¶ 85.

In addition to providing anesthesiology services, USAP had what it characterizes as "Administrative Service Agreements" ("ASA") with three other independent anesthesia groups. *Id.* ¶ 109; Doc. #50 at 7. Two of these ASAs were executed by GHA and Pinnacle, and were inherited by USAP upon acquisition. Doc. #1 ¶¶ 111, 115. In 2013, USAP entered a third ASA on its own accord. *Id.* ¶ 120. Under the ASAs, independent anesthesia groups assigned USAP authority to bill and receive reimbursements for hospital-only anesthesia services. *Id.* USAP would use the billing authority to charge its higher, GHA-level reimbursement rates. *Id.*

In the several years after USAP's formation in 2012, Fund XI's majority interest in the company declined as equity was issued to new USAP physician partners. *Id.* ¶ 19. By 2017, Fund

XI owned 44.8% of USAP. *Id.* In 2017, Fund XI sold its equity, and Defendant Welsh, Carson, Anderson & Stowe XII, L.P. ("Fund XII") bought a 23% interest in USAP.[1] *Id.* After selling off a large share of its interest, Welsh Carson retained authority to appoint only two Board members. *Id.* ¶ 19–21.

### b.   The FTC Action

On September 21, 2023, the Federal Trade Commission ("FTC") filed suit against USAP and Welsh Carson in this District, and the case is currently pending before the Honorable Kenneth M. Hoyt (the "FTC Action"). *Id.* ¶ 125. The FTC's complaint seeks a permanent injunction and other equitable relief based on "substantially the same misconduct" as Plaintiffs allege in this case. *Id.* USAP and Welsh Carson sought dismissal of the FTC's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). *Fed. Trade Comm'n*, 2024 WL 2137649, at *3. Specifically, Welsh Carson argued that the FTC could not bring its suit under Section 13(b) of the FTC Act ("Section 13(b)") "because Welsh Carson is not violating antitrust laws, nor is it about to." *Id.* USAP moved to dismiss on the same basis as Welsh Carson, and additionally argued (1) "Section 13(b) requires a concomitant administrative proceeding, which the FTC has not begun," (2) "the FTC is unconstitutional because its commissioners are not removable at will by the President," and (3) "the FTC's claims are based on a myopic market definition, and that USAP has not raised prices above competitive levels." *Id.*

In resolving the Rule 12(b)(6) motions filed before him, Judge Hoyt determined that the

---

[1] The Court notes that the Complaint does not plead with clarity the distinction between the various Welsh Carson Defendants, and instead mostly lumps them all together. However, at the September 5 hearing, Plaintiffs effectively conceded that Fund XI was the entity held the initial 50.2% interest in USAP and sold its remaining interest in 2017. Fund XII then separately purchased a 23% interest in USAP in 2017, when Fund XI divested. These facts were also highlighted in the parallel FTC proceeding. *See Fed. Trade Comm'n*, 2024 WL 2137649, at *3.

FTC did not adequately allege that Welsh Carson "is violating" or "is about to violate" antitrust law, as required under Section 13(b). *Id.* at *3–6. In so doing, Judge Hoyt noted that "the FTC does not allege any conduct by Welsh Carson in the past six years that is a plausible antitrust violation." *Id.* at *6. Moreover, Judge Hoyt determined that "[t]he only sense in which the scheme still exists is that USAP still exists, and that USAP still consolidates the market and reduces competition. But that goes to USAP's violations, not Welsh Carson's[.]" *Id.* As such, Judge Hoyt granted Welsh Carson's motion to dismiss. *Id.*

With respect to USAP, Judge Hoyt found that the FTC had sufficiently alleged ongoing antitrust violations under Section 13(b). *Id.* at *7. Judge Hoyt also rejected USAP's arguments regarding the FTC's purported requirement to bring a concomitant administrative proceeding and the FTC's constitutionality. *Id.* at *6–8. On the merits, Judge Hoyt held that the FTC plausibly alleged a market definition of "hospital-only anesthesia services." *Id.* at *8. The FTC also plausibly alleged that USAP enjoys monopoly power, anticompetitive conduct, and "acquisitions resulting in higher prices for consumers, along with a market allocation and price-setting scheme." *Id.* at *9. Thus, Judge Hoyt denied USAP's motion to dismiss. *Id.*

### c.   Procedural History

On November 20, 2023, before this Court, Plaintiffs filed their Original Class Action Complaint (the "Complaint") against USAP and Welsh Carson, alleging claims for (1) monopolization under Section 2 of the Sherman Act ("Section 2"), (2) unlawful acquisition under Section 7 of the Clayton Act ("Section 7"), (3) conspiracy to monopolize under Section 2, (4) attempted monopolization under Section 2, (5) horizontal agreement to fix prices under Section 1 of the Sherman Act ("Section 1"), and (6) horizontal agreement to divide market under Section 1. Doc. #1 ¶¶ 146–193. On February 20, 2024, USAP and Welsh Carson filed their respective

Motions to Dismiss, seeking dismissal of all claims asserted against them pursuant to Rule 12(b)(6). Doc. Nos. 49, 50. The Court heard oral arguments on the Motions to Dismiss on September 5, 2024. First, the Court will resolve Welsh Carson's Motion to Dismiss. Doc #49. Then, the Court will turn to USAP's Motion to Dismiss. Doc. #50.

## II.      Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint need not contain 'detailed factual allegations'; rather, it need only allege facts sufficient to 'state a claim for relief that is plausible on its face.'" *Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 622 (5th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 663. "Significantly, a complaint may proceed even if 'recovery is very remote and unlikely,' so long as the alleged facts 'raise a right to relief above the speculative level.'" *Littell*, 864 F.3d at 622 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). In evaluating the complaint, the Court takes "the well-pleaded factual allegations in the complaint as true" but does "not credit conclusory allegations or allegations that merely restate the legal elements of a claim." *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016).

## III.     Analysis

### a.     Welsh Carson's Motion to Dismiss

Welsh Carson argues that all of Plaintiffs' claims should be dismissed under Rule 12(b)(6) because they are time-barred under the applicable statute of limitations. Doc. #49 at 5–11. "The statute of limitations for antitrust claims is four years." *Chandler v. Phoenix Servs., L.L.C.*, 45 F.4th 807, 815 (5th Cir. 2022); *see also* 15 U.S.C. § 15b. Plaintiffs and Welsh Carson agree that

the limitations period in this case begins in September 2019—four years before the FTC initiated the FTC Action.  Doc. #49 at 6; Doc. #64 at 42; *see* 15 U.S.C. § 16(i).  Welsh Carson argues that much of the conduct alleged in the Complaint occurred prior to September 2019, and for the conduct that occurred after September 2019, Plaintiffs do not sufficiently allege Welsh Carson's involvement.  *See* Doc. #49 at 5–11.  In response, Plaintiffs argue that their claims are not time-barred under the "continuing violation" exception.  Doc. #64 at 40–45.

Generally, in federal antitrust cases, "a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research Inc.*, 401 U.S. 321, 338 (1971).  However, the continuing violation exception "permits a cause of action to accrue whenever the defendant commits an overt act in furtherance of an antitrust conspiracy or, in the absence of an antitrust conspiracy, commits an act that by its very nature is a continuing antitrust violation." *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1051 (5th Cir. 1982).  Plaintiffs argue that they have alleged a continuing violation because the Star and Guardian acquisitions occurred within the limitations period, and Welsh Carson is liable for this continuing violation because it either (1) was part of a continuing conspiracy with USAP, or (2) formed a "single enterprise" with USAP. Doc. #64 at 40–45.

Though Plaintiffs' conspiracy and single enterprise arguments are somewhat distinct, they both largely implicate the Supreme Court's decision in *Copperweld Corporation v. Independence Tube Corporation*, 467 U.S. 752 (1984).  In *Copperweld*, the Supreme Court held that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act." 467 U.S. 752, 771 (1984).  As such, a parent and its wholly owned subsidiary "are incapable of conspiring with each other for purposes of

8

[Section 1]." *Id.* at 777; *see also Chandler v. Phoenix Servs.*, No. 7:19-CV-00014-O, 2020 WL 1848047, at *13 (N.D. Tex. Apr. 13, 2020) (noting that *Copperweld*'s single enterprise theory also applies to Section 2 (citing *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1233 (10th Cir. 2017)), *aff'd*, 45 F.4th 807 (5th Cir. 2022). "Although *Copperweld* addressed the specific relationship between a parent company and its wholly owned subsidiary, '[l]ower courts have since applied *Copperweld*'s reasoning (sometimes referred to as the 'single-entity' rule) to a broader variety of economic relationships.'" *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1233 (10th Cir. 2017) (quoting *Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1034 (9th Cir. 2005)).

The Supreme Court expanded on *Copperweld* in *American Needle, Inc. v. National Football League*, where it reiterated that "although a parent corporation and its wholly owned subsidiary are 'separate' for the purposes of incorporation or formal title, they are controlled by a single center of decisionmaking and they control a single aggregation of economic power." 560 U.S. 183, 194 (2010) (citing *Copperweld*, 467 U.S. at 769). Thus, in determining whether two entities are capable of conspiring with each other, "the question is not whether the defendant is a legally single entity or has a single name; nor is the question whether the parties involved 'seem' like one firm or multiple firms in any metaphysical sense." *Id.* at 195. Rather, as the Supreme Court explained:

> The key is whether the alleged contract, combination, or conspiracy is concerted action—that is, whether it joins together separate decisionmakers. The relevant inquiry, therefore, is whether there is a contract, combination, or conspiracy *amongst separate economic actors pursuing separate economic interests*, such that the agreement deprives the marketplace of independent centers of decisionmaking, and therefore of diversity of entrepreneurial interests, and thus of actual or potential competition.

*Id.* (cleaned up) (emphasis added). Thus, there are two questions before the Court: (1) whether

USAP and Welsh Carson were capable of conspiring with each other under *Copperweld*, and (2) if they are not capable of conspiring with each other, whether Plaintiff has sufficiently alleged that Welsh Carson is liable under a single enterprise theory.

### 1. Conspiracy

The first issue is whether Welsh Carson and USAP are capable of conspiring, such that Welsh Carson can be held liable for USAP's conduct in furtherance of the alleged conspiracy that occurred after the limitations period. *See Powers v. Nassau Dev. Corp.*, 753 F.2d 457, 461 (5th Cir. 1985) (noting that, in the context of a continuing conspiracy, antitrust "conspirators are bound by the acts of any one of them"). Here, the Complaint alleges that Rizzo approached Welsh Carson in 2012 about forming the company that ultimately became USAP. Welsh Carson then agreed to provide the start-up capital that formed USAP, as well as develop a market plan and provide due diligence. At USAP's formation, Fund XI owned a majority stake in the company, but that majority stake steadily declined until 2017, when Fund XI sold its equity. At that point, Fund XII purchased a 23% interest in USAP.

The Court finds that the Complaint does not allege that Welsh Carson and USAP were "separate economic actors pursuing separate economic interests." *Copperweld*, 467 U.S. at 769; *Am. Needle*, 560 U.S. at 197. Rather, the Complaint alleges that Welsh Carson and USAP shared "a complete unity of interest" and had common objectives with respect to USAP's success in the relevant anesthesia markets. *Copperweld*, 467 U.S. at 771; *Am. Needle*, 560 U.S. at 196. Moreover, as an investment firm, Welsh Carson did not "compete" with USAP in the anesthesiology market. *See Am. Needle*, 560 U.S. at 196–97 (finding that NFL teams were capable of conspiring in part because they compete against each other in the relevant markets). Thus, under *Copperweld*, the Court finds that Welsh Carson and USAP cannot conspire with each other. *See*

10

*Top Rank, Inc. v. Haymon*, No. CV154961JFWMRWX, 2015 WL 9948936, at *16 (C.D. Cal. Oct. 16, 2015) (granting an investment firm's Rule 12(b)(6) motion to dismiss where it committed "funding, business expertise, and operational supervision" to a company because they were not capable of conspiring under *Copperweld*).   As such, Welsh Carson cannot be held liable for USAP's actions after the limitations period based on an alleged conspiracy between them.

### 2.  Single Enterprise

Because the Court has determined that Welsh Carson and USAP cannot conspire under *Copperweld*, the next question is whether Welsh Carson can be liable for USAP's actions after the limitations period based on a single enterprise theory.  Welsh Carson argues it cannot be held liable on a single enterprise theory because Plaintiffs do not sufficiently allege its independent participation within the limitations period. Doc. #71 at 4.  Plaintiffs argue that it need only allege Welsh Carson's involvement in the alleged anticompetitive scheme "generally," and is not required to plead Welsh Carson's independent participation in the post-limitations period conduct. *See* Doc. #64 at 44.

Though the Fifth Circuit has not addressed the "independent participation" requirement under the single enterprise theory, district courts in this Circuit have looked to other federal circuit courts that have addressed the issue.  *See Chandler*, 2020 WL 1848047, at *12 ("Accordingly, the Court looks to the single-enterprise-liability standard advanced by the Ninth Circuit and the Tenth Circuit—the only two federal circuits to have addressed the issue." (citing *Arandell Corp. v. Centerpoint Energy Servs.*, 900 F.3d 623 (9th Cir. 2018); *Lenox*, 847 F.3d 1221), *aff'd*, 45 F.4th 807 (5th Cir. 2022).

In *Arandell*, the Ninth Circuit noted that "*Copperweld* speaks only of a 'unity of purpose,'" and "does not supply a theory of unbounded vicarious liability for the acts of legally distinct

entities." 900 F.3d at 632 (quoting *Copperweld*, 467 U.S. at 771). "Rather, *Copperweld* states that commonly-owned-but-legally-distinct entities are considered a 'single entity' for antitrust purposes where they engage in 'coordinated activity.'" *Id.* (quoting *Copperweld*, 467 U.S. at 771). As such, "*Copperweld* does not support holding a subsidiary liable for the parent's independent conduct." *Id.* (citing *Lenox*, 847 F.3d at 1237). Likewise, in *Lenox*, the Tenth Circuit held that, in a federal antitrust case, a plaintiff alleging a single enterprise is "required to come forward with evidence that each defendant *independently participated* in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise." 847 F.3d at 1237 (emphasis added).

Almost all of the alleged wrongful conduct in the Complaint occurred prior to September 2019—which is when the limitations period began to run in this case. The only alleged conduct that occurred after the limitations period are two acquisitions: (1) USAP's acquisition of Star in September 2019 and (2) USAP's acquisition of Guardian in 2020. Plaintiffs argue these acquisitions constitute overt acts that, in essence, re-started the four-year statute of limitations under the continuing violation exception. Doc. #64 at 25, 41–43. However, by the time the Star and Guardian acquisitions occurred, Welsh Carson's involvement with USAP had dwindled considerably. Indeed, Fund XI, which made the initial investment in USAP and acquired a majority interest, completely divested in 2017. Since then, the only alleged involvement by Welsh Carson is the 23% interest Fund XII purchased in 2017, and its current ability to appoint two out of fourteen members of USAP's Board. Other than Fund XII's minority-investor status, the allegations in the Complaint that tie Welsh Carson to the Star or Guardian acquisitions are scant. Plaintiffs only allege that "USAP and Welsh Carson first earmarked Star as a potential acquisition" in 2013—six years before USAP actually acquired Star. Doc. #1 ¶ 81. And with respect to Guardian, Plaintiffs do not allege any Welsh Carson involvement. *Id.* ¶ 82.

12

Based on the foregoing, the Court finds that Plaintiffs have not sufficiently alleged Welsh Carson's "independent[] participat[ion] in the enterprise's scheme" during the limitations period. *Lenox*, 847 F.3d at 1237. Rather, Plaintiffs, like the FTC, have failed to "allege any conduct by Welsh Carson in the past six years that is a plausible antitrust violation." *Fed. Trade Comm'n*, 2024 WL 2137649, at \*5. Because "*Copperweld* does not support holding a subsidiary liable for the parent's independent conduct" and Plaintiffs only allege conduct by *USAP* within the limitations period, the Court finds Plaintiffs cannot confer liability on Welsh Carson using the single enterprise theory. Therefore, the Court finds that Plaintiffs' claims are time-barred, and Welsh Carson's Motion to Dismiss should be granted.

**b.   USAP's Motion to Dismiss**

USAP has also moved to dismiss the Complaint in its entirety. Doc. #50. Specifically, USAP argues (1) Plaintiffs lack standing, (2) Plaintiffs have failed to plausibly allege a relevant product market, (3) Plaintiffs have failed to state a claim under Section 2, (4) Plaintiffs have failed to state a claim under Section 7, and (5) Plaintiffs have failed to state a claim for price fixing under Section 1. *Id.* The Court will address each of USAP's bases for dismissal in turn.

**1.   Standing**

First, USAP argues that the Complaint should be dismissed in its entirety because Plaintiffs do not allege that they are "direct purchasers," and thus Plaintiffs do not have standing to bring their antitrust claims. Doc. #49 at 8–10. In *Illinois Brick Company v. Illinois*, the Supreme Court held that "direct purchasers" can sue antitrust violators, but "indirect purchasers" cannot. 431 U.S. 720, 746 (1977). "The bright-line rule of *Illinois Brick* . . . means that indirect purchasers who are two or more steps removed from the antitrust violator in a distribution chain may not sue. By contrast, direct purchasers—that is, those who are 'the immediate buyers from the alleged antitrust

13

violators'—may sue." *Apple Inc. v. Pepper*, 587 U.S. 273, 280 (2019) (quoting *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207 (1990)).  The Supreme Court provided an illustrative example of this "bright-line rule": "if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A. But B may sue A if A is an antitrust violator. And C may sue B if B is an antitrust violator." *Id.*

Here, Plaintiffs' allegations, which the Court accepts as true, are that they "directly reimburse[] healthcare providers," like USAP, "who treat [their] members." Doc. #1 ¶¶ 14–15. Plaintiffs also allege that, due to USAP's wrongful conduct, they "have paid artificially inflated reimbursement rates." *Id.* ¶ 10.  Finally, Plaintiffs allege they have "paid USAP for hospital anesthesia services" provided to Plaintiffs' plan participants. *Id.* ¶¶ 14–15.  Thus, Plaintiffs have plainly alleged that they are direct purchasers of USAP's services.

USAP's arguments to the contrary are unpersuasive—at least at the motion to dismiss stage.  USAP argues that Plaintiffs are indirect purchasers because commercial insurers are the entities that negotiate rates of reimbursement with USAP. Doc. #50 at 9–10. Self-funded insurers, like Plaintiffs, then contract with the commercial insurers for access to provider networks and pay the rates negotiated by the commercial insurers. *Id.*  In essence, USAP argues that the commercial insurers are a middleman, which precludes Plaintiffs from being direct purchasers.  However, as USAP conceded at the September 5 hearing, this "chain of distribution" is not alleged in the Complaint.  For instance, Plaintiffs do not allege that commercial insurers purchase services from USAP and then re-sell those services to Plaintiffs.  Rather, Plaintiffs allege that they "directly reimburse" USAP for the healthcare services it provides. Doc. #1 ¶¶ 14–15.  Thus, Plaintiffs have not alleged that they are indirect purchasers.

USAP also relies on *In re NorthShore University HealthSystem Antitrust Litigigation* for

the proposition that the "the direct victim of antitrust harm" is the insurer rather than the self-funded payer. No. 07-CV-4446, 2018 WL 2383098, at *2 (N.D. Ill. Mar. 31, 2018); Doc. #50 at 9. However, *Northshore* is nonbinding. Moreover, that case resolved a motion to decertify the class, and thus did not apply the same Rule 12(b)(6) standard that the Court applies here. *Northshore*, 2018 WL 2383098, *1. At this stage of the case, where the Court accepts Plaintiffs' allegations as true, the Court finds that Plaintiffs have sufficiently alleged that they are direct purchasers with standing to pursue their antitrust claims.[2]

### 2. Relevant Product Market

Next, USAP argues that all of Plaintiffs' claims must be dismissed for failure to allege a relevant product market. Doc. #50 at 11–13. To state a claim under the Sherman Act and Clayton Act, a plaintiff must plausibly plead a relevant product market. *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 454 (5th Cir. 2021) (Sherman Act); *Apani Sw., Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620, 625 (5th Cir. 2002) (Clayton Act). "Whether a relevant market has been identified is usually a question of fact; however, in some circumstances, the issue may be determined as a matter of law." *Apani*, 300 F.3d at 628. A motion to dismiss may be granted where (1) "the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand," or (2) the plaintiff "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products." *Id.* However, "the cases in which dismissal on the pleadings is appropriate typically involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity or (2) failure even to attempt a plausible explanation as to why a market should be limited

---

[2] This does not foreclose USAP's ability make arguments related to the direct purchaser rule at a later stage of the case, should discovery reveal evidence that suggests Plaintiffs are indirect purchasers under *Illinois Brick*.

15

in a particular way." *Corrente v. Charles Schwab Corp.*, No. 4:22-CV-00470, 2023 WL 2244680, at *3 (E.D. Tex. Feb. 24, 2023).

Here, Plaintiffs' alleged product market is "hospital-only anesthesia services reimbursed by commercial payors." Doc. #1 ¶ 25. USAP argues that (1) Plaintiffs fail to allege interchangeability or cross-elasticity of demand, and (2) the "hospital-only" market definition does not encompass all interchangeable substitute products. Doc. #50 at 11–13. Notably, Judge Hoyt rejected these same arguments when USAP advanced them in the FTC Action. *Fed. Trade Comm'n*, 2024 WL 2137649, at *8 (involving the same product market and substantially the same factual allegations). For the reasons discussed below, this Court agrees with Judge Hoyt's sound analysis.

Plaintiffs have alleged that there are no "substitute[s] for hospital only services" and "[p]atients requiring hospital admission . . . necessarily must receive anesthesia services in a hospital." Doc. #1 ¶ 27. This is because "non-negotiable medical considerations" drive the decision as to what anesthesia services a patient requires. *Id.* In short, patients who need anesthesia services in a hospital cannot, as a practical matter, choose who provides those services or where those services are provided. *See Fed. Trade Comm'n*, 2024 WL 2137649, at *8 (noting that, "as a practical matter[,] once a patient requires treatment in a hospital, out-of-hospital anesthesiology services are off the table"). In addition, Plaintiffs allege that "[t]he industry recognizes the distinct characteristics of hospital-only anesthesia services." Doc. #1 ¶ 26. For instance, the Centers for Medicare and Medicaid Services, private insurers, and hospitals use different billing codes for hospital anesthesia services. *Id.* The Complaint also alleges that USAP itself recognizes hospital-only anesthesia services as distinct. *Id.* ¶ 29. Thus, based on the allegations in the Complaint, the Court finds that Plaintiffs have met their burden at the Rule

12(b)(6) stage to allege a relevant product market.

### 3. Section 2 Claims

Next, USAP moves to dismiss all of Plaintiffs' Section 2 claims. Doc. #50 at 13–22. The Court has already determined that USAP and Welsh Carson are incapable of conspiring under *Copperweld*, which means Plaintiffs' conspiracy to monopolize claim must be dismissed. *Supra* pp. 7–11. Thus, Plaintiffs' only remaining Section 2 claims are monopolization and attempted monopolization.

"To state a claim for monopolization, a plaintiff must allege: (i) a relevant product and geographic market; (ii) the possession of monopoly power in such market; and (iii) the willful acquisition or maintenance of that power." *Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*, 802 F. Supp. 1544, 1550 (S.D. Tex. 1991). And "to state a claim for attempted monopolization" under Section 2, "a plaintiff must allege: (i) a relevant product and geographic market; (ii) a specific intent to monopolize that market; (iii) exclusionary or predatory conduct in furtherance of the attempted monopolization; and (iv) a dangerous probability that, absent judicial intervention, the attempt will be successful." *Id.* at 1552–53. USAP argues that Plaintiffs' Section 2 claims should be dismissed because (1) the Complaint fails to allege that USAP has a monopoly power, and (2) the Complaint fails to allege anticompetitive or exclusionary conduct. Doc. #50 at 13–18. Judge Hoyt rejected these same arguments in the FTC Action. *Fed. Trade Comm'n*, 2024 WL 2137649, at *9. As discussed below, the Court finds Plaintiffs have likewise sufficiently alleged their Section 2 claims.

### i. Monopoly Power

USAP first argues that Plaintiffs have failed to allege monopoly power because USAP has not raised prices above the competitive level. "[E]vidence of a defendant's market share is the

17

principal tool used by courts to determine the existence of monopoly power." *Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*, 679 F.2d 516, 521 (5th Cir. 1982). Moreover, "[o]nce the relevant market has been determined, the existence of monopoly power 'ordinarily may be inferred from the predominant share of the market.'" *Heatransfer Corp. v. Volkswagenwerk, A. G.*, 553 F.2d 964, 981 (5th Cir. 1977); *see also In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 382 (E.D. La. 2013) ("A nonconclusory allegation that a defendant holds a predominant share of the relevant market will usually satisfy the monopoly power element of a monopolization claim.").

Here, Plaintiffs allege that, in 2019, USAP achieved 50% market share in Texas, rising to a high of 60% in 2020. Doc. #1 ¶ 85. Now, USAP holds 57% of the Texas market. *Id.* ¶ 6. Plaintiffs also allege that USAP raised prices considerably by taking the "highest rate . . . in one distinct market and then peanut butter spread[ing] that [rate] across the entire state of Texas." *Id.* ¶ 8. Indeed, USAP's current rates of reimbursement are nearly 40% higher than the average cost of anesthesia services in Texas. *Id.* Plaintiffs also allege that USAP "leveraged market share to establish rates over two times higher than other Houston anesthesiologists." *Id.* ¶ 77. Because Plaintiffs have plausibly alleged a relevant market, that USAP holds a majority of that relevant market, and that USAP raised prices above competitive levels, the Court finds that the Complaint sufficiently alleges USAP's monopoly power.[3] *See Fed. Trade Comm'n*, 2024 WL 2137649, at

---

[3] USAP also argues that Plaintiffs have failed to allege monopoly power under the No Surprises Act and Texas' state law equivalent, S.B. 1264. Doc. #50 at 16–18. In short, the No Surprises Act and S.B. 1264 prevent out-of-network providers from "balance billing," or charging patients for "the difference between the out-of-network provider's price and what the insurer agrees to cover." *Guardian Flight LLC v. Health Care Serv. Corp.*, No. 3:23-CV-1861-B, 2024 WL 2786913, at *5 (N.D. Tex. May 30, 2024); *see also Tex. Med. Res., LLP v. Molina Healthcare of Tex., Inc.*, 659 S.W.3d 424, 428 (Tex. 2023). USAP cites no authority to support its position that either of these laws constitute a "regulatory scheme which performs the antitrust function." *Silver*

*9.

### ii.    Anticompetitive Conduct

Second, USAP argues Plaintiffs have failed to plausibly allege exclusionary or anticompetitive conduct.   Doc. #50 at 19–21.   Specifically, USAP argues that the only "anticompetitive conduct" Plaintiffs allege are the various acquisitions of USAP's competitors, which is not sufficient to state a Section 2 claim under Rule 12(b)(6).  *Id.*  However, "[t]he Supreme Court has established that acquiring a viable competitor constitutes anticompetitive conduct under [S]ection 2."  *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606, 619 (W.D. La. 2016) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 576 (1966)).   Here, Plaintiffs not only allege that USAP acquired its competitors to form a monopoly, but that USAP raised prices following each acquisition.  And, as noted above with respect to USAP's monopoly power, USAP's acquisitions resulted in it holding a majority market share in Texas.  *Supra* pp. 17–18.  "These considerations also apply to USAP's argument that [Plaintiffs have] failed to allege anticompetitive conduct."  *Fed. Trade Comm'n*, 2024 WL 2137649, at *9.  As such, the Court finds that Plaintiffs have plausibly alleged anticompetitive conduct.  USAP's Motion to Dismiss is therefore denied to the extent it seeks dismissal of Plaintiffs' Section 2 monopolization and attempted monopolization claims.

### 4. Section 7 Claim

USAP next moves to dismiss Plaintiffs' unlawful acquisition claim under Section 7.  Doc. #50 at 22.  "To state a claim under [Section] 7, a plaintiff must (1) define the relevant market and (2) demonstrate the probability of anticompetitive results flowing from the challenged

---

*v. New York Stock Exch.*, 373 U.S. 341, 358 (1963).  Thus, at this stage, the Court finds that neither the No Surprises Act nor S.B. 1264 prevent Plaintiffs from plausibly alleging monopoly power.

transaction." *Corrente*, 2023 WL 2244680, at *3 (citing *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 491–92 (5th Cir. 1984)).  USAP argues that Plaintiffs have failed to allege the second element. Doc. #50 at 22.  "Typically, a [Section] 7 plaintiff can survive a motion to dismiss by establishing a prima facie case that the 'transaction in question will significantly increase market concentration.'" *Corrente*, 2023 WL 2244680, at *5 (quoting *Chi. Bridge & Iron Co. N. V. v. F.T.C.*, 534 F.3d 410, 423 (5th Cir. 2008)).  Here, Plaintiffs have alleged a series of acquisitions by USAP that "increased market concentration." *See id.* ("At the pleadings stage, allegations of this nature, which indicate that a transaction has resulted in increased market concentration, are sufficient to survive a motion to dismiss.").  Thus, USAP's Motion to Dismiss is denied to the extent it seeks dismissal of Plaintiffs' Section 7 claim.

### 5. Section 1 Claim

Finally, USAP moves to dismiss Plaintiffs' price fixing claim under Section 1 because the Complaint fails to sufficiently allege an agreement among competitors to fix prices. Doc. #50 at 22–25.  The elements of a Section 1 violation are (1) a conspiracy or agreement by the defendant (2) that restrained trade (3) in a particular market. *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 525 (5th Cir. 2022) (citation omitted).  Under the Sherman Act, "price-fixing agreements are unlawful per se." *United States v. Jindal*, No. CV 4:20-CR-00358, 2021 WL 5578687, at *4 (E.D. Tex. Nov. 29, 2021) (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940)).  "The scope of conduct found to constitute horizontal price-fixing agreements warranting application of the per se rule is broad." *Id.*  Here, Plaintiffs allege that USAP had Administrative Service Agreements with three of its competitors.  According to the Complaint, under the ASAs, USAP was delegated the authority to set the rates of reimbursement (i.e., prices) for these competitors. Doc. #2 ¶¶ 114, 117, 121.  At the pleading stage, the Court

finds that these allegations are sufficient to state a claim for price fixing under Section 1, which covers a "broad" scope of conduct. *See Jindal*, 2021 WL 5578687, at *4.  As such, USAP's Motion to Dismiss is denied with respect to Plaintiff's price fixing claim.

## IV.    Conclusion

In conclusion, the Court finds that Plaintiffs' claims against Welsh Carson are time-barred. Thus, Welsh Carson's Motion to Dismiss is hereby GRANTED and Plaintiffs' claims against Welsh Carson are DISMISSED WITH PREJUDICE.  Doc. #49.  In addition, USAP's Motion to Dismiss is hereby GRANTED IN PART.  Doc. #50.  Specifically, Plaintiffs' Section 2 conspiracy to monopolize claim against USAP is DISMISSED.  However, Plaintiffs have sufficiently alleged their remaining claims.  Thus, USAP's Motion to Dismiss is DENIED with respect to Plaintiffs' claims for monopolization and attempted monopolization under Section 2, unlawful acquisition under Section 7, and horizontal agreement to fix prices and divide market under Section 1.

It is so ORDERED.

SEP 2 7 2024
_____
Date

_____
The Honorable Alfred H. Bennett
United States District Judge